982 P.2d 890

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Elmo Joe TAFOYA, Defendant–Appellant.**

**No. 21766.**

Supreme Court of Hawai'i.

Aug. 27, 1999.

As Amended Sept. 2, 1999.

action.

James Tagupa, on the briefs, Lihue, for defendant-appellant.

Bryant Zane, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by NAKAYAMA, J.

Defendant-appellant Elmo Joe Tafoya, Jr. appeals his conviction and sentence of one count of assault in the second degree. On appeal, Tafoya asserts that (1) he was denied the effective assistance of counsel at his trial and (2) there was insufficient evidence presented at his sentencing hearing to warrant the imposition of an extended term of imprisonment pursuant to Hawai'i Revised Statutes (HRS) § 706–662(5) (Supp.1998). We affirm Tafoya's conviction. However, we agree that the extended term of imprisonment was improperly imposed. Therefore, we reverse the circuit court's imposition of an enhanced sentence, vacate the sentence imposed and remand for resentencing without enhancement.

## I.  BACKGROUND

The following facts were not disputed at trial. On June 28, 1997, Tafoya went to the apartment of his mother, Rosemarie Lawrence, who resided at Eleele Elderly Housing, an apartment complex for disabled and elderly persons located in Port Allen, Kaua'i. Tafoya's presence at the apartment complex was in apparent violation of a trespass order issued on January 31, 1996.[1] When Tafoya arrived, Lawrence was not present. Tafoya entered Lawrence's apartment and used her phone to call his girlfriend in California. Upon returning to her apartment, Lawrence told Tafoya to hang up the phone, but he refused. Lawrence then went to summon her boyfriend, 61–year–old Tommy Silva, also a resident at Eleele Elderly Housing.

Silva entered the apartment and approached Tafoya. Tafoya testified that Silva

---

1.  This warning forbade Tafoya from returning to the Eleele Elderly Housing complex and provided that his presence in the area would lead to arrest and prosecution for the offense of criminal trespass in the second degree. Lawrence was the complainant. Tafoya testified at trial, however, that Lawrence was aware of his pending visit on June 28, 1997 and had given her consent to his presence.

grabbed him from behind and then slapped him. Silva testified that he told Tafoya to get off the phone and Tafoya ignored this request. Thereafter, when he turned to walk away, Tafoya began hitting him. The testimony of Silva and Tafoya agreed that a lengthy physical altercation followed.

As a result of the altercation, Silva sustained multiple facial fractures, required nine stitches, and was bleeding from his nose and eyes. Tafoya suffered no injuries whatsoever. Silva testified that, as he was leaving, Tafoya told him that "if I call the cops he was going to kill me when he got out of jail."

Tafoya left the apartment and was arrested later that day. In the police car, Tafoya spontaneously stated to the arresting officer, Derek Lorita, that "he punched the victim because no one tells him to get off the phone when he's talking to his girlfriend."

On July 3, 1997, Tafoya was charged via complaint with one count of assault in the second degree, one count of criminal trespass in the first degree, and one count of terroristic threatening in the second degree. As to the first count, the complaint alleged that

> on or about the 28th day of June, 1997, in the County of Kaua'i, State of Hawai'i, Elmo Joe Tafoya, Jr. did intentionally or knowingly cause substantial bodily injury to Thomas Silva, a person sixty years of age or older, thereby committing the offense of Assault in the Second Degree in violation of Section 707–711(1)(a) and Section 706–660.2 of the Hawai'i Revised Statutes.

The case proceeded to trial on February 9 and 10, 1998. At trial, Tafoya claimed self-defense as a defense to the assault charge. On appeal, the sole issue raised by Tafoya in relation to his conviction is that he was denied the effective assistance of counsel due to his trial counsel's affirmative introduction of, and failure to object to, evidence of Tafoya's prior bad acts and criminal convictions.

In opening statement, Tafoya's attorney stated that:

> The evidence will show that a scuffle ensued where [Tafoya] and—with Thomas Silva wrapped around [Tafoya] from behind, the evidence will show that they fell forward onto a glass table in [Lawrence's] living room, breaking the table. That's where the cuts on the forearm came from, not from any vicious beating by [Tafoya].
>
> Blows were exchanged. [Tafoya] is a tough guy. [Tafoya's] a strong guy. [Tafoya] has a prior criminal record. I'm not going to hold any of this back from you. I'm not going to lie to you and say that he has no prior criminal record. But when you're grabbed from behind by a complete stranger, the evidence will show that his action was reasonable.

Tafoya testified. During direct examination, the following exchanges occurred:

> [Defense counsel] Q. And during the period of time [growing up] in Stockton[, California] and thereafter, were you ever involved in youth gangs?
>
> [Tafoya] A. Yes, I was.
>
> Q. Briefly describe that.
>
> A. I was in a youth gang in Stockton, California, called BCS. My dad's side of the family is into gangs and my uncle was the leader of the gang.
>
> Q. During that period of time in the youth gang were you ever arrested or convicted for violent offenses?
>
> A. No, sir.
>
> . . .
>
> Q. Prior to arriving on Kauai did you notify your mom that you were coming?
>
> A. Yes.
>
> Q. Where was that from?
>
> A. From Maui.
>
> Q. And where were you on Maui?
>
> A. I was in the correctional facility there working on the pine line.
>
> . . .
>
> [Describing the physical altercation between Silva and himself]
>
> A. It didn't take very long.
>
> . . .
>
> Q. Do you believe that you may have thrown some blows during that time?
>
> A. Yes, I do.
>
> Q. Do you believe that those blows made contact?
>
> A. Yes, I do.

On cross-examination, the following testimony was adduced without objection by defense counsel.

[Prosec. atty.]  Q. Is it not true, Mr. Tafoya, that on July 25th of 1996 in the Family Court you pled no contest to causing abuse of a family or household member of [sic] your mother?

[Tafoya] A. Yes.

Q. And that in fact you were sentenced to nine months imprisonment on September 26th of 1996 for beating up your mother?

A. No. I was sentenced, but not for beating up my mom.  It was part of a plea bargain negotiation with multiple charges that was—it was part of a plea bargain.

. . .

Q. Now there was also another incident whereby you went into your mom's house again without permission on October 25th of 1995.  And this is the one you're talking about breaking the telephone, correct?

A. I don't know.

Q. The telephone shaped like a 1957 Chevy.  Do you recall that incident?

A. Yes, I remember breaking the telephone.

Q. Okay. And also her ceramic cat that was on her coffee table and the corner table, correct?

A. No.

Q. Didn't you throw the phone at your mother in that incident, causing her to hit her glasses and her head?

. . .

A. I deny it.

Q. You remember getting arrested for that, though, correct?

A. I got arrested for it.

. . .

[Describing the altercation with Silva]

A. I'm not going to deny the fact that I punched him because I know we had a scuffle.  Now, if I punched him in the face or in the arm or legs or whatevers, I just know that I was defending myself.  So he might have got punched in the face, in the arm, back, who knows, neck.

. . .

Q. Weren't you arrested for assault with a deadly weapon in 1982, Mr. Tafoya?

A. Yes, I was.

Q. Okay. Mr. Tafoya, weren't you arrested for terroristic threatening in the second degree?

. . .

A. [My girlfriend's] mom called the police from Honolulu. . . .

Q. Well, Mr. Tafoya, it was because she was concerned because she heard you telling her daughter that you were going to put her in a body bag and send her to her mom's and that was the only way that she was going to Honolulu, correct?

A. . . . I wouldn't say that's correct, no.

. . .

[Describing the aftereffects of the altercation.]

Q. You didn't have any injuries, right?

A. Right.

Q. He wasn't hitting you at all, correct?

A. That I'm not sure of . . . . like I said, I wasn't focusing on anything other than this person.  I mean, I don't know how far the door was away.  We were in the kitchen. I wasn't looking to the door to get out, I was looking to—you know, get this man off of me and so I had control of the situation. I didn't—I wasn't going to run out the door.  For all I know he could have been a burglar or something coming into my mom's house.  He's lucky I didn't take his life.

The following exchanges then occurred during redirect examination.

[Defense counsel] Q. Do you argue with the facts concerning the abuse of household member charge that was part of a global plea agreement?

[Tafoya] A. Yes.

Q. You contest those facts?

A. Yes.

Q. Okay, do you also contest the facts surrounding the [girlfriend] incident?

A. Yes.

Q. Were any of those charges ever proven before a jury or a court?

A. No, sir.

Q. Were all of those charges that the prosecutor brought up part of plea agreements that were never factually proven?

A. Yes, sir.

The jury was instructed, *inter alia*, that

[i]n Count I of the Complaint, the Defendant is charged with the offense of Assault in the Second Degree.

A person commits the offense of Assault in the Second Degree if he intentionally or knowingly causes substantial bodily injury to another person.

There are two material elements of the offense of Assault in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That on or about the 28th day of June, 1997, in the County of Kaua'i, State of Hawai'i, the Defendant caused substantial bodily injury to another person; and

2. That the Defendant did so intentionally or knowingly.

After deliberation, the jury returned a verdict on February 10, 1998, of not guilty on the trespass and terroristic threatening charges. The jury returned a verdict of guilty on the charge of assault in the second degree.

On March 20, 1998, the prosecution filed a motion to impose sentence of extended term of imprisonment pursuant to HRS § 706–662(5) (Supp.1998).[2] On April 17, 1998, new counsel was appointed to represent Tafoya. At the sentencing hearing, conducted on June 18, 1998, Tafoya opposed the motion for extended term, arguing that:

[The prosecution] has to show that [Tafoya] knew or reasonably knew that the victim in this matter was over the age of 60. And I believe in this case . . . the evidence

at trial, first of all, indicates that he never knew this person at all. Because the first time he met this person was when they had this altercation. . . . I don't believe there's any evidence that would indicate that he even knew the age or anything regarding this person.

On June 22, 1998, the sentencing court entered findings of fact and conclusions of law granting the prosecution's motion for imposition of an extended term. These provided, in pertinent part, that:

[T]he Court having heard argument of counsel, having presided over the jury trial, having fully been advised in the premises, and having considered the files and records of this case, makes the following findings of fact [ (FOF) ] and conclusions of law[ (COL).]

[FOF No. 3] Thomas Silva was sixty-one years of age at the time of the assault.

4. Thomas Silva lived at Eleele Elderly Housing, which is where the assault took place.

5. Defendant's mother also lived at Eleele Elderly Housing.

6. Thomas Silva was the boyfriend of Defendant's mother.

7. Thomas Silva testified in Defendant's trial, and was observed by the Court as appearing to be over the age of sixty.

8. Defendant has prior convictions for violent and/or felony criminal offenses such as Grand Theft, Burglary in the Second Degree, Resisting Arrest, Robbery, Assault in the Third Degree, Terroristic Threatening in the Second Degree and Abuse of Family and Household Members.

---

2. This section provides that:

A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:

. . . .

(5) The defendant is an offender against the elder, handicapped, or minor under the age of eight whose imprisonment for an extended term is necessary for the protection of the

public. The court shall not make this finding unless:

. . . .

(b) The defendant, in the course of committing or attempting to commit the crime, inflicts serious or substantial bodily injury upon a person who is:

(i) Sixty years of age or older; . . . and

(c) Such disability is known or reasonably should be known to the defendant.

[9.] Defendant committed the present assault within five days of being released from prison.

[10.] The State failed to show that Defendant was represented by Counsel or waived his Constitutional Right to be represented by Counsel in the two prior felony convictions.

### CONCLUSIONS OF LAW

1. Defendant, in the course of committing felonious assault, inflicted substantial bodily injury upon Thomas Silva, a person Defendant knew or reasonably should have known was sixty years of age or older and thus is an offender against the elderly[.]

2. Based on the criminal history of the Defendant and the nature and circumstances of the present offense, an extended term of imprisonment is necessary for the protection of the public.

Tafoya was sentenced to an extended indeterminate prison term of ten years.[3] Tafoya timely appealed his conviction and sentence. On appeal, Tafoya argues that (1) he was denied the effective assistance of counsel and (2) there was insufficient evidence to support an extended term of imprisonment.

## II. DISCUSSION

**A. Tafoya was not denied the effective assistance of counsel because trial counsel's representation did not result in the withdrawal or substantial impairment of a potentially meritorious defense.**

When an ineffective assistance of counsel claim is raised, the question is:

"When viewed as a whole, was the assistance provided to the defendant 'within the range of competence demanded of attorneys in criminal cases?'" Additionally,

> the defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*State v. Edwards,* 81 Hawai'i 293, 300, 916 P.2d 703, 710 (1996) (quoting *State v. Silva,* 75 Haw. 419, 439–40, 864 P.2d 583, 593 (1993)).

The prosecution defends trial counsel's strategy on the grounds that the evidence of Tafoya's prior bad acts and criminal convictions was intentionally introduced in order to bolster the subjective reasonableness of his self-defense argument.[4] Upon review of the record, we believe that this was, indeed, the most likely strategy of trial counsel. We note, particularly, his opening statement, in which he juxtaposed an overview of Tafoya's criminal history with an assertion that Tafoya's actions were reasonable.

This court faced a similar situation in *State v. Smith,* 68 Haw. 304, 712 P.2d 496 (1986), and rejected defense counsel's "strategy" of intentionally disclosing his client's prior history as ineffective. In *Smith,* the defendant was charged with attempted sodomy of a

---

3. HRS § 706–661 (1993) provides, in pertinent part, that:

> In the cases designated in section 706–662, a person who has been convicted of a felony may be sentenced to an extended indeterminate term of imprisonment. When ordering such a sentence, the court shall impose the maximum length of imprisonment which shall be as follows:
>
> ...
>
>   (3) For a class C felony—ten years.

4. HRS § 703–304 (1993) provides that:

> (1) [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.
>
> (2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape or forcible sodomy.

The commentary on this section states that "the actor must believe that the particular degree of force used by him is necessary. This formulation is not meant to require a precise equation, but it will limit the defense to situations in which a particular scope and degree of retaliation is believed by the actor to be appropriate to the aggression."

five-year-old girl. His defense consisted of an assertion that he was only exposing himself to the girl and was not attempting to have her perform oral sex upon him. The trial court had previously granted a motion in limine to exclude evidence of prior convictions and prior offenses that did not result in conviction. A new defense attorney was appointed, however, who decided to adduce extensive evidence of his client's prior history in order to make his client's defense more credible.

> [A]n opening statement [was] delivered by counsel in which the defendant was characterized, *inter alia*, as a fantasizer, a former convict, a pervert, and an exhibitionist. Counsel thus opened the defense of the charge of attempted sodomy by setting to naught his predecessor's effort to keep the jury from hearing evidence of certain aspects of defendant's criminal history[.]
>
> . . .
>
> Though forewarned that this course of action [of "putting everything out on the table"] was fraught with peril, he nonetheless urged the defendant to "[t]ell us about the past five years of your life . . ." and adduced evidence of six prior burglary convictions and incarceration in the penitentiary as a consequence, as well as testimony about a "quirk" defendant had of exposing himself.
>
> Where, as in this case, the success of the asserted defense hinged on defendant's

credibility, we would be hard put to say instructions from the court probably had the desired curative effect, particularly when the damaging information of prior convictions and incarceration was conveyed to the jury by defense counsel and again by the defendant at the urging of counsel.

*Id.* at 311–12, 712 P.2d at 501.

■ The situation herein is facially similar to *Smith*. If trial counsel had not opened the door to such evidence, Tafoya's prior convictions and evidence of his membership in a youth gang or unconvicted arrests would have been inadmissible.[5] Upon review of the entire record, we are convinced that trial counsel's representation failed the first prong of the ineffective assistance of counsel test, in that "there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence." While some information about Tafoya's upbringing may have been relevant to his subjective reaction to violence, a laundry list of prior violent acts, arrests, and prior convictions was plainly unwarranted and unjustifiable.[6]

However, upon review of the entire record, we cannot say that trial counsel's representation caused the "withdrawal or substantial impairment of a potentially meritorious defense." HRS § 707–711 (1993) provides that the offense of assault in the second degree is proven if "(a) [t]he person intentionally or knowingly causes substantial bodily injury to

---

**5.** HRE Rule 404(b) (1993) provides in relevant part that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." HRE Rule 609(a) (1993) provides:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is inadmissible except when the crime is one involving dishonesty. However, in a criminal case where the defendant takes the stand, the defendant shall not be questioned or evidence introduced as to whether the defendant has been convicted of a crime, for the sole purpose of attacking credibility, unless the defendant has oneself introduced testimony for the purpose of establishing the defendant's credibility as a witness, in which case the defendant shall be treated as any other witness as provided in this rule.

Under both of these rules, evidence of Tafoya's prior convictions for, *inter alia*, assault and terroristic threatening would neither be admissible

to prove that he committed the instant offense nor for attacking his credibility.

**6.** Because trial counsel's actions may warrant disciplinary action, we refer this case to the Office of Disciplinary Counsel. *Accord Bettencourt v. Bettencourt*, 80 Hawai'i 225, 230, 909 P.2d 553, 558 (1995) (Where attorney's actions "[did] not comport with the precepts embodied in the [Hawai'i Rules of Professional Conduct (HRPC) ], we are compelled to refer the supreme court record in this case, as we must pursuant to the Revised Code of Judicial Conduct Canon 3(D)(2) (1992), to the Office of Disciplinary Counsel for its review and appropriate action.") (Footnote omitted.)). *See also* HRPC Rule 1.1 ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.").

another; [or] (b) the person recklessly causes serious bodily injury to another person[.]"

In the instant case, Tafoya relies solely on a claim of self-defense as a justification for his actions. Tafoya's claim of self-defense must fail as a matter of law. The amount of force used in self-defense must be proportionate to the threat.[7] It is undisputed that Silva, a 61–year–old nursing home resident, sustained substantial injuries as a result of Tafoya's conduct. He suffered multiple facial fractures, required nine stitches, and was bleeding from the eyes and nose. Tafoya testified that he had no injuries as a result of the incident. Tafoya claimed that Silva "slapped him" from behind when he was on the phone. His testimony did not allege that any further force was threatened by Silva requiring him to act in self-defense. Even if Tafoya's testimony is credited in full, the amount of force used by Tafoya to respond to Silva's "threat" was, as a matter of law, unjustifiable.

Tafoya's testimony regarding the events of the altercation destroys any potential for acquittal of the charge of assault in the second degree on the grounds of self-defense. Because Tafoya's testimony is separable from trial counsel's lack of judgment, and based upon Tafoya's own statements, he lacked a potentially meritorious defense to the offense for which he was convicted, we cannot reverse his conviction despite the failings of his counsel. Recently, this court held that "[defense counsel's actions] reflected a 'lack of skill, judgment or diligence[.]' Nevertheless, given the overwhelming evidence linking [defendant] to the crimes charged, we do not believe that counsel's failure ... 'resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.'" *Edwards,* 81 Hawai'i at 301, 916 P.2d at 711 (citation omitted). As in *Edwards,* the overwhelming nature of the evidence against Tafoya and the failure of his self-defense claim as a matter of law warrants affirmance of his conviction.

It must also be noted that trial counsel's defense of Tafoya was not wholly ineffective. The jury acquitted Tafoya of the trespass and terroristic threatening charges, despite knowledge of Tafoya's criminal history. The basis of the terroristic threatening charge was Silva's claim that Tafoya threatened to kill him if he called the police. This was denied by Tafoya and determination of this issue was, therefore, based solely on the jury's assessment of witness credibility.

Similarly, with respect to the trespass charge, a trespass order was issued to Tafoya in 1996 and remained in effect. Tafoya claimed that his mother had given him permission to be present on the property, which his mother denied. Apparently the jury, despite its knowledge of Tafoya's background, still believed his testimony in part. This mitigates any inference that the erroneous admission of Tafoya's background irrevocably prejudiced the jury against him.

For all of the above reasons, we reject Tafoya's claim of ineffective assistance of counsel and affirm his conviction for assault in the second degree.

**B. The predicate factual findings necessary to support the imposition of an enhanced sentence pursuant to HRS § 706–662(5) must be made by the trier of fact.**

Tafoya argues that there was insufficient evidence to warrant the imposition of an extended term of imprisonment pursuant to HRS § 706–662(5), *see supra* note 2. The sentencing court made findings of fact (1) that Silva was sixty years of age or older at the time of the assault and (2) that Tafoya knew or reasonably should have known this fact. In light of recent United States Supreme Court pronouncements on the constitutionality of allowing the sentencing court, rather than the trier of fact, to make factual findings necessary for the imposition of an

---

7. The commentary on HRS § 703–304 (1993) provides in relevant part:

> Subsection (1) requires a belief by the actor that the use of protective force is actually necessary, and that unlawful force ... is to be used by the assailant. He must believe, fur-

ther, that immediate use of force is required[.] ... Finally, *the actor must believe that the particular degree of force used by him is necessary.*

(Emphasis added).

enhanced sentence, we are obliged initially to determine whether these findings, which are essential to the imposition of an enhanced term of imprisonment, may legitimately be made by the sentencing court, or whether they are required to be submitted to and found by the trier of fact.

In differentiating between findings that must be made by the sentencing court and those that must be alleged in the indictment and found by the trier of fact during the trial, we have previously held that:

> [T]he "historical facts" pertinent to the imposition of extended prison terms pursuant to HRS § 706–662 are to be found by the sentencing court *after* the defendant's adjudication of guilt at trial by the trier of fact.... [T]his particular fact-finding process is wholly independent of the allegation of any foundational "aggravating circumstances" in the indictment or complaint containing the charges against the defendant.... [This rule] is limited to enhanced sentencing, such as extended prison terms pursuant to HRS §§ 706–661, 706–662 and 706–664, in which the "determination that the defendant is a member of the class of offenders to which the particular [statute] applies involves 'historical facts.'" [*State v.*] *Huelsman,* 60 Haw. [71,] 79, 588 P.2d [394,] 400 [ (1978) ]. This is because such "historical facts" are wholly *extrinsic* to the specific circumstances of the defendant's offenses and therefore have no bearing on the issue of guilt *per se.* By contrast, if the "aggravating circumstances" justifying the imposition of an enhanced sentence are "enmeshed in," or, put differently, *intrinsic* to the "commission of the crime charged," then, in accordance with the [*State v.*] *Estrada* [, 69 Haw. 204, 738 P.2d 812 (1987) ] rule, such aggravating circumstances *"must* be al-

leged in the indictment in order to give the defendant notice that they will be relied on to prove the defendant's guilt and support the sentence to be imposed, and they must be determined by the trier of fact."

*State v. Schroeder,* 76 Hawai'i 517, 528, 880 P.2d 192, 203 (1994) (citation omitted) (emphases in original) (some brackets in original and some added).[8]

We have not, previously, analyzed at length the precise considerations which render a finding "intrinsic" as opposed to "extrinsic." Previous decisions of the Hawai'i appellate courts determining that certain facts are "intrinsic" include *State v. Lincoln,* 3 Haw.App. 107, 643 P.2d 807 (1982) (holding that the "for hire" element was an aggravating circumstance to the crime of murder in the first degree and was properly decided by the jury); *State v. Lester,* 64 Haw. 659, 649 P.2d 346 (1982) (same); *State v. Tachibana,* 67 Haw. 573, 698 P.2d 287 (1985) (same);[9] *Garringer v. State,* 80 Hawai'i 327, 909 P.2d 1142 (1996) (actual or constructive possession of a shotgun during a robbery had to be found by the jury in order to impose an enhanced sentence); *State v. Kang,* 84 Hawai'i 352, 933 P.2d 1386 (App.1997) (indictment which alleged use of a "rifle" was insufficient to allow the court to impose an enhanced sentence for use of a "semiautomatic" weapon because such was "intrinsic" to the offense); *State v. Vanstory,* 91 Hawai'i 33, 979 P.2d 1059 (1999) (factual finding regarding use of a "semiautomatic" firearm is an intrinsic aggravating circumstance that must be made by the jury).

Previous Hawai'i appellate court decisions have held that an enhanced sentence imposed pursuant to HRS §§ 706–662(4) (1978 & 1993) and 706–662(1) and (2) (1993) involved "extrinsic" findings. *See Huelsman,* involv-

---

8. In *Schroeder,* we analyzed at length the historical development of this issue in Hawai'i jurisprudence, beginning with *State v. Apao,* 59 Haw. 625, 586 P.2d 250 (1978) and continuing through *Huelsman,* and *Estrada.* It is unnecessary at this point to retrace the history of Hawai'i precedent which was ably covered by our discussion in *Schroeder.*

9. These cases were decided prior to the 1986 amendment of the murder statute, which cur-

rently defines the offense of murder in the first degree as "A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of: ... (d) A person by a hired killer[.]" HRS § 707–701(1) (1993). Therefore, the fact that the murder was "for hire" is now an element of the offense of murder in the first degree and is no longer an aggravating circumstance.

ing a finding, pursuant to HRS § 706–662(4) (1978), that "[t]he defendant is a multiple offender whose criminality was so extensive that a sentence of imprisonment for an extended term is warranted";[10] *State v. Okumura,* 78 Hawai'i 383, 894 P.2d 80 (1995) (same with respect to HRS § 706–662(4) (1993)); *State v. Villeza,* 85 Hawai'i 258, 274–75, 942 P.2d 522, 538–39 (1997) (involving HRS § 706–662(3) (1993), finding that "[t]he defendant is a dangerous person whose imprisonment for an extended term is necessary for protection of the public"); and *State v. Cornelio,* 84 Hawai'i 476, 935 P.2d 1021 (1997), and *State v. Toro,* 77 Hawai'i 340, 884 P.2d 403 (App.1994) (finding, pursuant to HRS § 706–662(1), that "[t]he defendant is a persistent offender.... The court shall not make this finding unless the defendant has previously been convicted of two felonies committed at different times when the defendant was eighteen years of age or older"). Because these involve "extrinsic" factors, the relevant predicate findings are to be made by the sentencing court.

█ In reviewing our previous case law, it is apparent that "intrinsic" factors, required to be pled in the indictment and found by the jury, are distinguishable in that they are contemporaneous with, and enmeshed in, the statutory elements of the proscribed offense. Contrarily, "extrinsic" factors are separable from the offense itself in that they involve consideration of collateral events or information. Occurrence at a prior time is indicative, although not dispositive, of a conclusion that a factor is "extrinsic."[11] For example, HRS § 706–662(2)(a) (Supp.1997) provides that a defendant may be sentenced to an extended term of imprisonment upon a finding that "[t]he defendant is a professional criminal[.] The court shall not make this finding unless ... the *circumstances of the crime* show that the defendant has knowingly engaged in criminal activity as a major source of livelihood[.]" (Emphasis added). Although this section refers to the "circum-

stances of the crime," and therefore implies consideration of information contemporaneous with the commission of the offense, this finding is nevertheless "extrinsic." A finding under this section is separable from the statutory elements of the offense in a manner qualitatively different from, for example, the "intrinsic" finding that the offender utilized a semiautomatic weapon in the course of committing the offense charged. Requiring the jury to make such a finding would require the admission of potentially irrelevant and prejudicial evidence and contaminate the jury's required focus on the specific elements of the offense charged, *see* further discussion of this point, *infra.*

█ With the above distinction between "intrinsic" and "extrinsic" factors in mind, we turn to HRS § 706–662(5), the enhanced sentencing statute at issue herein. In *Huelsman,* we made a blanket statement that the required findings under all sections of HRS § 706–662 were to be made by the sentencing judge. More recently, in *State v. Robinson,* 82 Hawai'i 304, 922 P.2d 358 (1996), we followed *Huelsman* and specifically held that a finding regarding the age of the victim under HRS § 706–662(5) was to be made by the sentencing court. Our opinion in *Robinson,* however, accepted *Huelsman 's* statement that the age of the victim was "extrinsic," but did not adequately analyze the issue. Upon further reflection, we hold that findings regarding (a) the age or handicapped status of the victim and (b) whether "[s]uch disability is known or reasonably should be known to the defendant" entail "intrinsic" facts. These findings are inextricably enmeshed in the defendant's actions in committing the offense charged. Although the sentencing court followed our previous pronouncements in making the challenged factual findings, we hold today that the Hawai'i Constitution requires that these findings be made by the trier of fact, over-

---

10. This statute was subsequently amended and reads, in its current form, "[t]he defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an extended term is necessary for protection of the public." HRS § 706–662(4) (Supp.1998).

11. Although *Schroeder* only discussed "historical facts" as being "extrinsic" factors, occurrence at a prior time is neither necessary nor dispositive of a determination that a particular factor is "extrinsic."

ruling *Robinson* and *Huelsman* insofar as they held to the contrary.

Our decision today, as is implicit in our previous decisions, rests upon the necessity of upholding a defendant's constitutional rights to trial by jury and procedural due process.[12] While the necessity of implementing the rule, explicated in *Schroeder*, to protect the constitutional right to trial by jury may be viewed as implicit in our previous decisions, we explain this aspect of the rule in greater detail today, in light of the recent United States Supreme Court opinion in *Jones v. United States*, — U.S. —, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

The *Jones* Court called into question the constitutional validity of allowing a sentencing judge to make findings of fact leading to an extended term of imprisonment. In *Jones*, the Court was faced with interpretation of a federal carjacking statute.[13] The Court determined that, as a matter of statutory interpretation, it was possible to interpret the statute in two ways. First, it could interpret the statute as creating three separate offenses, with "serious bodily injury" and "death" as additional elements of a separate offense. Second, it could interpret the statute as creating a single offense, with the level of injury being solely an aggravating factor leading to a longer sentence. The Court adopted the first construction of the statute, under the principle of "constitutional doubt."[14] In doing so, the Court stated that the second possible interpretation "would raise serious constitutional questions on which precedent is not dispositive." *Jones*, 119 S.Ct. at 1228. Specifically, the *Jones* Court identified the question as: "[W]hen a jury determination has not been waived, may

judicial factfinding by a preponderance support the application of a provision that increases the potential severity of the penalty for a variant of a given crime?" *Id.* at 1224. The Court declined to actually answer this question, instead suggesting that the answer might be that,

> under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Id.* at 1224 n. 6.

The court explicitly stopped short of actually adopting this holding.

> It is not, of course, that anyone today would claim that every fact with a bearing on sentencing must be found by a jury; we have resolved that general issue and have no intention of questioning its resolution. The point is simply that diminishment of the jury's significance by removing control over facts determining a statutory sentencing range would resonate with the claims of earlier controversies, to raise a genuine Sixth Amendment issue not yet settled.

*Id.* at 1226. However, the Court plainly cautioned that

> [i]f serious bodily injury were merely a sentencing factor under § 2119(2) (increasing the authorized penalty by two thirds, to 25 years), then death would presumably be nothing more than a sentencing factor under subsection (3) (increasing the penalty range to life). If a potential penalty might rise from 15 years to life on a nonju-

---

12. The operative provisions of the Hawai'i State Constitution state that: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury[.]" Haw. Const. art. I, § 14; and "[n]o person shall be deprived of life, liberty or property without due process of law[.]" *Id.* § 5

13. This statute, 18 U.S.C. § 2119 provided, at the time of the commission of the offense, that:

> a person possessing a firearm who "takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation . . . shall—(1) be . . . imprisoned not

more than 15 years . . ., (2) if serious bodily injury . . . results, be . . . imprisoned not more than 25 years . . ., and (3) if death results, be . . . imprisoned for any number of years up to life[.]"

*Jones*, 119 S.Ct at 1218 (ellipses in original).

14. This principle is that, " 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.' " *Jones*, 119 S.Ct. at 1222 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836 (1909)).

ry determination, the jury's role would correspondingly shrink from the significance usually carried by determinations of guilt to the relative importance of low-level gatekeeping: in some cases, a jury finding of fact necessary for a maximum 15–year sentence would merely open the door to a judicial finding sufficient for life imprisonment.

*Id.* at 1224.

■ After careful consideration of the issue raised by the *Jones* Court, we agree with the majority that it is an impermissible dilution of the jury's role as factfinder to remove the responsibility for determining the existence of facts leading to the imposition of a particular punishment. In our view, the scheme outlined in *Schroeder* protects the interests identified by the *Jones* majority. Because *Jones* stopped short of adopting this requirement under the federal constitution, it did not address the range of facts subsumed within its suggested rule.[15] We hold that when a fact susceptible to jury determination is a predicate to the imposition of an enhanced sentence, the Hawai'i Constitution requires that such factual determinations be made by the trier of fact. The legislature may not dilute the historical province of the jury by relegating facts necessary to the imposition of a certain penalty for criminal behavior to the sentencing court. The jury is the body responsible for determination of intrinsic facts necessary for the imposition of punishment for an offense criminalized by the legislature. The analysis in *Schroeder* protects the jury's role by mandating that the determination of facts intrinsic to the offense be made by the trier of fact.

Academic commentary to consider this issue has strongly opined that removal of factfinding responsibility from the jury undermines the jury's historical role. *See* John Poulos, Liability Rules, Sentencing Factors, and the Sixth Amendment Right to a Jury Trial: A Preliminary Inquiry, 44 U. Miami. L.Rev. 643, 701 (1990) [hereinafter "Liability Rules"]; and Benjamin Rosenberg, Criminal Acts and Sentencing Facts: Two Constitutional Limits on Criminal Sentencing, 23 Seton Hall L.Rev. 459 (1993) [hereinafter "Constitutional Limits"].

If enhanced sentencing statutes relegate factfinding determinative of the sentence to be imposed to the sentencing judge,

> the jury's role can be reduced to a minimum by a legislature's definition of a crime. Therefore, the jury's determination is simply the first of several decisions that affect the defendant, rather than the authoritative voice of the community's moral conscience; it is neither the decision most deeply imbued with moral significance, nor necessarily the decision that has the most practical importance for the defendant.

Constitutional Limits at 481.[16]

> [U]nless there is a substantive restraint on legislative power, a legislative body could avoid the jury trial requirement by allocating the determination of the existence of an aggravating circumstance to the sentencing hearing. But the sixth amendment right to a jury trial serves as a

---

15. The majority opinion in *Jones* suggested that, potentially, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 1224 n. 6. Insofar as "extrinsic" factors, such as those listed in HRS § 706–662(2) through (4), *supra*, are not facts susceptible of jury determination, they do not fall within the rule suggested by *Jones*. It would contaminate the jury's required focus on the factual circumstances surrounding the offense and potentially require the introduction of inadmissible prior bad act or overly prejudicial evidence to require the jury to make such findings. Therefore, we decline to extend our holding herein to such "extrinsic" factors.

16. *See also Walton v. Arizona,* 497 U.S. 639, 710–11, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Stevens, J., dissenting):
> [I]n 1791, when the Sixth Amendment became law ... "the English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury had the power to determine not only whether the defendant was guilty of homicide but also the degree of the offense...." By stretching the limits of sentencing determinations that are made by judges ... decisions have encroached upon the factfinding function that has so long been entrusted to the jury.

(Footnote omitted.) (Quoting White, Fact–Finding and the Death Penalty: The Scope of a Capital Defendant's Right to Jury Trial, 65 Notre Dame L.Rev. 1, 10–11 (1989).)

restraint on legislative power. Quite obviously, the sixth amendment would fail to cabin legislative choices if a legislature could control the jury trial right by simply designating that the court rather than a jury try a particular issue.... A rule permitting such a result would wholly fail to serve the purpose for including the right to trial by jury in the sixth amendment.

Liability Rules at 669 (footnotes omitted).

■ However, certain findings that the legislature has determined may be utilized to impose an extended term of imprisonment are either not factual, and therefore inappropriate for jury determination, or would require the introduction of improper prior bad act evidence. For example, HRS § 706–662(2) provides that a convicted defendant may be subject to an extended term of imprisonment if:

The defendant is a professional criminal whose imprisonment for an extended term is necessary for protection of the public. The court shall not make such a finding unless:

(a) The circumstances of the crime show that the defendant has knowingly devoted oneself to criminal activity as a major source of livelihood; or

(b) The defendant has substantial income or resources not explained to be derived from a source other than criminal activity.

If we were to require these findings to be made by the jury, this would entail collateral determinations unrelated to the jury's fundamental duty to focus on the evidence presented and determine whether the conduct of the defendant violated the statutory definition of the offense.[17] Therefore, these "extrinsic" factors are properly within the province of the sentencing court.

■ We have previously held that there is no substantive difference between the procedures required for the imposition of a mandatory minimum term of imprisonment and an extended term of imprisonment. *See Robinson,* 82 Hawai'i at 315, 922 P.2d at 369 ("This court has not deemed the characterization of a sentence as 'extended' or 'enhanced' determinative of the procedures required.") We expressly recognized in *Robinson* that

[B]oth section 706–662(5) and 706–660.2 delineate, as *an aggravating circumstance,* infliction of serious or substantial bodily injuries to a victim who is: (1) sixty years of age or older; (2) blind, paraplegic, or quadriplegic; or (3) eight years of age or younger.... [These] subsections delineate the two options available to the sentencing court once it has found that the defendant is within the class of offenders to which those subsections apply: (1) if the court thereafter finds that an extended term is necessary for the protection of the public, sentence is imposed pursuant to section 706–662(5); but (2) if the court thereafter finds that an extended term of imprisonment is *not* necessary for the protection of the public, it *must* impose a mandatory minimum term of imprisonment pursuant to HRS § 706–660.2.

82 Hawai'i at 316, 922 P.2d at 370 (emphases in original). We reaffirm that, for constitutional purposes, there is no distinction between extended and mandatory minimum enhanced sentencing. Both constrain the discretion of the sentencing judge and fix the term of incarceration imposed upon the defendant as a result of the conviction.[18]

---

17. *Accord* Constitutional Limits at 505, stating that:

[A]sking the jury to expand its focus beyond the alleged criminal transaction would risk severe prejudice. Unattractive background information might turn a jury against a defendant even if there is insufficient evidence of the crime charged. By requiring the jury to focus exclusively on the alleged criminal transaction, the jury is prevented from receiving information that may prejudice it for or against defendant.

18. *Jones* reaffirmed the holding in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), that facts leading to the imposition of a *mandatory minimum* sentence could be found by the sentencing judge without violation of the due process clause of the fourteenth amendment or the sixth amendment right to jury trial. Justice Stevens, concurring, opined that

I am convinced that it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.... [A] proper understanding

The requisite findings that (a) Silva was sixty years of age or older and (b) Tafoya knew or reasonably should have known this fact, necessary to support the imposition of an extended sentence pursuant to HRS § 706–662(5),[19] were constitutionally required to be made by the jury. We therefore reverse the imposition of an extended term of imprisonment under HRS § 706–662 and remand for resentencing without enhancement.

## III. CONCLUSION

For the foregoing reasons, we affirm Tafoya's conviction. We reverse the circuit court's imposition of an enhanced sentence, vacate the sentence imposed and remand for resentencing without enhancement. Insofar as *Huelsman* and *Robinson*, cited *supra*, are inconsistent with this opinion, they are hereby overruled.

of this principle encompasses facts that increase the minimum as well as the maximum permissible sentence[.]
*Jones* at 1228–29 (Stevens, J., concurring).

19. The finding whether an extended term of imprisonment is necessary for the protection of the public, also necessary for imposition of an extended term of imprisonment pursuant to HRS § 706–662(5), is *not* a factual finding susceptible to jury determination. Therefore, this finding is within the province of the sentencing court pursuant to the rule explicated, *supra*.