986 P.2d 306

**STATE of Hawai'i, Plaintiff–Appellee/Cross–Appellant,**

v.

**Frank Charles JANTO, Defendant–Appellant/Cross–Appellee.**

**No. 21576.**

Supreme Court of Hawai'i.

Oct. 21, 1999.

Sarah Courageous, on the briefs, for defendant-appellant/ cross-appellee

Donn Fudo, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee/cross-appellant.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by NAKAYAMA, J.

Defendant-appellant Frank Janto appeals his conviction and sentence of one count of murder in the second degree. On appeal, Janto argues that: (1) the trial court erred in denying his motion to suppress three statements made to the police; (2) the trial court erred in admitting certain items of evidence; (3) the prosecutor committed misconduct; (4) the trial court's evaluation of his mental competency and fitness to proceed was inadequate; and (5) his trial counsel was ineffective. The prosecution filed a cross-appeal regarding the sentencing court's denial of its motion for an extended term pursuant to Hawai'i Revised Statutes (HRS) § 706–657 (1993). We affirm Janto's conviction. On the cross-appeal, we affirm the circuit court's determination that, pursuant to our decisions in *State v. Schroeder*, 76 Hawai'i 517, 880 P.2d 192 (1994), and *State v. Tafoya*, 91 Hawai'i 261, 982 P.2d 890 (1999), the findings necessary to impose an enhanced sentence under HRS § 706–657 must be made by the trier of fact. Therefore, the circuit court correctly denied the prosecution's motion for enhanced sentence.

## I. BACKGROUND

On June 9, 1997, Bongak Koja, a retiree, left her home at approximately 3:00 a.m. to go jogging. She never returned. In the morning of June 9, 1997, Carol Ichimura, a custodian at Leilehua High School, discovered a deep pool of blood approximately two feet across on the grounds of the school. Ichimura hosed off the pavement and cleaned up the entire area. Melissa Katayama, a teacher at Leilehua, arrived at school and observed Ichimura "cleaning up something really red that was kind of draining down into the street area." Ichimura told her the substance was blood. No police report was made at that time. On June 11, 1997, Katayama saw a report of a missing person on the news and contacted the police to report the pool of blood.

Honolulu Police Department (HPD) officer Philip Camero was assigned to investigate Katayama's report. He discovered a pale stain where the pool of blood had been, a trail of blood drops leading down the hallway, and bloodstains on a dumpster. Between June 9 and 11, 1997, the dumpster had been emptied and its contents transported to the H–Power incineration plant. In a trash can, the police discovered a mace can and a walkman headphone. A witness, Arthur Sagon, who was employed by the school, testified that he found the canister and headphone on the school grounds and placed them in the trash can.

A piece of dental bridgework was recovered in front of the school. Doctor Harold Matsunaga, Koja's dentist, testified that he had fitted Koja with permanent replacement teeth cemented into her mouth. He stated that the bridgework recovered at the crime scene matched Koja's. A bent pair of eyeglass frames and a fragment of a lens were recovered at the scene. Doctor Arthur Kobayashi, Koja's optometrist, testified that the lens had the same prescription as, and the frames were identical to, a pair owned by Koja.

On June 12, 1997, Janto voluntarily approached an HPD police officer and stated that he wanted to talk with him about an incident involving a missing person. The officer transported Janto to the Wahiawā police station, where he met with Detective Allan Castro. Prior to interviewing Janto, Detective Castro completed a written form entitled "Warning Persons Being Interrogated of Their Constitutional Rights." This form provided in relevant part that:

> Before I ask you any questions, you must understand your rights. You have a right to remain silent. You don't have to say anything to me or answer any of my questions. Anything you say may be used against you at your trial. You have a right to counsel of your choice or to talk to anyone else you may want to. You also have a right to have an attorney present while I talk to you. If you cannot afford an attorney, the court will appoint one for you.

Janto initialed and signed the form, indicating that he did not wish an attorney, understood his rights, and wished to waive his rights and give a statement. Castro and Detective Harold Fitchett then questioned Janto in a tape-recorded interview. In the June 12, 1997 interview, Janto denied having any knowledge of Koja's disappearance.

On June 14th, Janto telephoned Castro and told him that he wanted to give a statement. Janto was transported to the Wahiawā police station. Prior to interviewing Janto, Castro again had Janto complete the written form waiving his constitutional rights, which Janto signed and initialed. The interview commenced at 1:32 p.m. and was tape-recorded. At the beginning of the interview, the following exchange occurred:

> [Castro] Q. Are you having any problems understanding me right now?
>
> [Janto] A. No.
>
> Q. In the last twenty-four hours, did you have any alcohol?
>
> A. Yes.
>
> Q. About how much did you have?
>
> A. Quart of beer.
>
> Q. One quart of beer?
>
> A. Yeah.
>
> Q. What time did you finish that beer?
>
> A. About 9 o'clock last night.
>
> Q. . . . Okay, so right now, is that alcohol affecting you?
>
> A. No.
>
> Q. So you feel okay right now?
>
> A. Yes.
>
> Q. Okay, did you take any drugs in the last twenty-four hours?
>
> A. Yes.
>
> Q. What did you take?
>
> A. Ice, crystal methamphetamine.
>
> Q. Did you take a lot, just a couple hits?
>
> A. About a quarter gram.
>
> Q. Is that a lot?
>
> A. Not a whole lot.
>
> Q. What time did you finish taking that?

A. About 10 o'clock last night.

Q. About 10 o'clock last night. So, we're looking at about fourteen and a half hours ago, so—is that thing affecting your thinking right now?

A. No.

Q. So you understand—you're able to understand me?

A. Yes.

Q. You understand what's going on?

A. Yes.

In the course of the interview, Janto confessed to killing a woman and described the events of the night in exhaustive detail. Evidence discovered at the scene confirmed that his victim was Koja. Janto's story, in brief, is that he approached Koja "just joking around with her." She sprayed him in the face with mace and he grabbed her head and pounded it on the cement. He then took her body and dragged it to the dumpster where he covered it with trash and left. Janto stated that he felt bad about hurting Koja and that he knew he had left bloody fingerprints at the scene; therefore, he decided he should voluntarily come to the police. Castro arrested Janto for murder.

On June 16, 1997, Castro and Janto went to the grounds of Leilehua High School to reconstruct the events of June 9. Prior to asking Janto any questions, Castro reviewed Janto's constitutional rights with him and Janto completed a written form waiving his rights. Janto then related the events of June 9, 1997, showing Castro specifically where each step of the attack and aftermath had occurred.

On June 20, 1997, Janto was charged via complaint with one count of murder in the second degree. On September 16, 1997, the prosecution filed a motion to determine admissibility of statements, requesting a ruling on the voluntariness of the statements given on June 12, 14, and 16, 1997. On September 16, 1997, Janto filed a motion to suppress all three statements on the grounds that they were obtained in violation of his constitutional rights.

On September 24, 1997, Janto filed a motion for appointment of examiners to determine fitness to proceed and penal responsi-

bility. On November 21, 1997, the circuit court granted Janto's motion and appointed Dr. Gary Farkas, Dr. Jarret Ko, and Dr. Jack Annon to render independent professional opinions regarding Janto's fitness to proceed and penal responsibility. On November 26, 1997, the circuit court ordered a neuropsychological examination pursuant to an oral request by Janto.

After hearings on November 17 and 21, 1997, the circuit court entered a written order denying Janto's motion to suppress statements. The order provided in pertinent part:

> [Janto] made three statements to the police within five days. Before each statement, [Janto] was informed of his right to have counsel present and to refuse to speak to the police at any time. At no time was there any hesitancy or apprehension by Defendant detected in the statements given.... [I]t is evident from [the transcript of the June 14th statement] that, before the Defendant gave a statement, he was given at least two opportunities to state on the tape his desire to have an attorney present, which he did not do. Moreover, the Court cannot overlook the undisputed fact that the Defendant had been arrested on numerous occasions, questioned by the police, and asserted his right to remain silent in the past.... Accordingly, the Court finds by a preponderance of the evidence that Defendant knowingly, intelligently and voluntarily waived his right to counsel[.]

The order further denied Janto's argument that his drug use invalidated the knowing and voluntary waiver of his rights.

On December 23, 1997, Dr. Annon filed his report with the circuit court. Dr. Annon conducted a clinical and forensic examination of Janto and reviewed his records. Dr. Annon's opinion was that "he does have sufficient capacity at the present time to understand the criminal proceedings against him and to assist in his own defense." Furthermore, Dr. Annon stated that,

> [b]ased on the limited data at my disposal, it is also my opinion that Mr. Janto: 1) did not lack substantial cognitive capacity to

know that what he was doing was wrong and to appreciate the wrongfulness of his conduct; and 2) did not lack substantial volitional capacity to control himself from committing the offenses charged, and to conform his conduct to the requirements of the law.

However, the findings from his Neuropsychological and neurological examinations were not yet available to me. Should these indicate any severe negative findings, then I would wish to reexamine him in regard to his volitional capacity.

On December 29, 1997, Dr. Farkas filed his report with the circuit court. Dr. Farkas interviewed Janto and reviewed his records. He opined "that Mr. Janto is able to understand the proceedings and assist in his own defense. At the time of the evaluation, he was fit to proceed.... It is my opinion that Mr. Janto's cognitive and volitional capacities were not substantially impaired at the time of the instant offense as a result of his mental conditions."

On January 2, 1998, Dr. Ko filed his report with the circuit court after interviewing Janto and reviewing his files. Dr. Ko opined that "the defendant is presently capable of understanding the proceedings against him and assisting in his own defense. It is also my opinion that the defendant's cognitive and volitional capacities were probably impaired at the time of the alleged offense, but I cannot say that they were substantially impaired."

The neuropsychological report was completed on December 22, 1997. It concluded that "[d]espite mild problems, Mr. Janto appears able to understand the charges against him and to assist in his defense."

The circuit court held a hearing on Janto's fitness to proceed on January 5, 1998. At the hearing, Janto's attorney stated, "Your Honor, in a review of the three panel letters and in discussions with my client and my own feelings as far as my communications with Mr. Janto, I don't believe there's any question about him being fit to proceed at this time." Janto's attorney made an oral request for an electroencephalogram (EEG), pursuant to the psychological reports. The court granted Janto's request and entered a written order on January 6, 1998 for an EEG to be performed.

Jury selection commenced on January 12, 1998. The EEG was performed on January 9, 1998, and the report was completed on January 13, 1998. On January 14, 1998, the following exchange occurred in the trial court regarding the EEG results:

[Janto's attorney] Dr. Popper[, the physician who performed the EEG,] ... reported that he believes there's definitely a sign of a mild abnormality or that the defendant is mildly abnormal in what he's seen so far. He believes that it warrants further testing. He's recommending what is called a CT scan, a MRI and a spec.... As far as a definitive what it all means or what this other testing would be able to provide for us, I don't have that answer at this point in time. So what I would ask is if the court will give me at least until tomorrow morning to try to get more information and at least be able to review these findings in light of all the things we have, all the other things we have, and to be able to speak to Mr. Janto about that as well.

[Court] Okay. That's fine. And this is the record, this is my ruling at this point in time in relation to your motion. Technically, for the record, you filed a motion for examination—appointment of examiners to determine his fitness to proceed and penal responsibility. Correct me if I'm wrong. That was filed on September 24th of 1997. We had our three-panel appointed. They conducted the examinations. Their reports are made a part of the record. They were received into evidence at the last hearing pursuant to a stipulation by the parties. Based on that, I think it was conceded by the defense, but even if it wasn't, I will make a finding, a specific finding now, that he is fit to proceed. Within those reports—I mean in addition to what was asked here, you had also asked that the court allow a neuropsychological exam.... That was performed. Based on that test and the report generated by Dr. [Fujii] ... well, the report speaks for itself as to what the EEG would do and what could evolve from that. And I

mentioned all of that at the last hearing. We had a full discussion on that. And the only question was whether or not I would allow it. . . . [B]ecause it could have been done and it was done within a week I allowed it.

Now, as far as any more testing is to be done in this case, I obviously am not going to allow it unless and until I have a full report by Dr. Fujii and the extent as to what and how these additional testings are going to impact, if at all, upon this issue of penal responsibility. And if I don't get that—in other words, I'm not directing you to tell the doctors this. I'm just letting you know my position so I don't have to elaborate any more in making a ruling. And if I don't get that, then obviously I'm not going to allow any further testing.

No further testing was ordered. The record is devoid of any further communication from the psychological examiners. The trial continued. During the trial, the circuit court admitted, over Janto's objection on the grounds of relevance and lack of foundation, the following pieces of evidence: (1) the dental bridgework; (2) the eyeglass frame; (3) the eyeglass lens fragment; (4) blood samples from the crime scene; and (5) photographs of the bloodstained walkway.

The jury found Janto guilty of murder in the second degree on January 26, 1998. On April 22, 1998, the prosecution filed a motion for enhanced sentence pursuant to Hawai'i Revised Statutes (HRS) § 706–657.[1] At the hearing on April 27, 1998, the circuit court orally ruled that,

in this situation the court would have to submit this issue to the jury because it depends on something that is intrinsic within the case as opposed to extrinsic. In

---

1. For the text of this section, see *infra* section E.

2. In relation to this point of error, Janto's appellate attorney alleges in the opening brief that Janto told her that the prosecuting attorney, Peter Carlisle, approached Janto's girlfriend and attempted to induce her to testify that he was abusive towards her. This so enraged Janto that he engaged in a public verbal outburst at the November 21, 1997 hearing on the motion to suppress. This outburst was reported by the news media, and Janto claims that it irrevocably prejudiced both the circuit court and the jury

other words, because the nature of the sentence involved, as Mr. Carlisle has pointed out and the statute has pointed out, it . . . would be something before the trier of fact. In this case I was not the trier of fact. I think *[State v.] Schroeder* [, 76 Hawai'i 517, 880 P.2d 192 (1994),] also points out that you need to have sufficient notice if that's the case and as such the notice would come at the time of the indictment. That's my reading of the cases in line with this section and what's being asked for by the court[;] accordingly, legally, the motion is denied.

On June 2, 1998, the circuit court filed a written order denying the prosecution's motion.

Janto thereafter timely appealed. On appeal, he argues that: (1) the trial judge erred by denying the motion to suppress his three statements to the police; (2) the circuit court did not adequately follow the statutorily mandated procedures regarding mental examination for fitness to proceed; (3) the circuit court erred by admitting certain items of evidence; (4) the prosecutor engaged in misconduct;[2] and (5) he was denied the effective assistance of counsel. The prosecution filed a cross-appeal. The sole issue raised in the cross-appeal is whether the circuit court erred in determining that enhanced sentencing under HRS § 706–657 must be alleged in the indictment and a finding made by the trier of fact.

## II. DISCUSSION

### A. The trial court did not err in denying Janto's motion to suppress his statements to the police.

■ Janto argues that his drug use rendered his confession involuntary. Specifically, he claims that

panel against him. The record on appeal does not contain any evidence that Carlisle actually approached Janto's girlfriend. Janto's alleged outburst at the November hearing is not part of the transcript. Janto's appellate attorney has not filed an affidavit regarding the substance of Janto's comments to her. Because the entire factual basis for this alleged point of error is not part of the record on appeal, we have no basis to rule on the merits of this claim. Therefore, we do not address Janto's allegation of prosecutorial misconduct.

there was ample evidence to indicate that he was under the influence of drugs at the time of both the June 12th and June 14th statements. He told police that he had been consuming crystal meth and cocaine prior to both statements. It was reasonable to presume that Janto's consistent and heavy use of crystal meth and cocaine, both mind-altering substances, did impair his ability to understand his rights and give free and voluntary statements to the police.

This court has previously ruled that:

In determining the admissibility of custodial statements, " 'the prosecutor must show that each accused was warned that he had a right to remain silent, that anything said could be used against him, that he had a right to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him.' " ...

Assuming ... that [these] minimal safeguards are observed, the accused may waive the right to counsel, provided that such waiver "is voluntarily and intelligently undertaken."

*State v. Hoey*, 77 Hawai'i 17, 33, 881 P.2d 504, 520 (1994) (quoting *State v. Nelson*, 69 Haw. 461, 467–68, 748 P.2d 365, 369 (1987)) (some citations omitted).

It is undisputed that Janto was fully informed of his constitutional rights as delineated in *Hoey, supra,* and completed a written waiver of those rights. Prior to eliciting the June 14, 1997 statement from Janto, Detective Castro engaged in a comprehensive examination of Janto's mental state and current level of intoxication. Janto specifically stated to Castro that it had been more than fourteen hours since he had ingested drugs or alcohol. Furthermore, Janto specifically stated that the drugs that he had taken the night before were not affecting his thinking or his decision to make a statement.

The trial court, in its written order denying Janto's motion to suppress, ruled that,

[i]n Court, the Defendant has testified and his counsel has argued that his rights could not have been knowingly and intelligently waived because of his drug use. Other than this bold assertion, there is nothing in the record to support this conclusion. In contrast, [the interview transcripts] refute this argument.

In each taped statement given by the Defendant, he was asked if he was currently under the influence of drugs and/or alcohol and each time Defendant [stated] that despite the fact that he had used drugs in the past, it had no effect on his ability to know what was going on. In addition, review of his statements leaves no doubt with the Court that Defendant's ability to recall and articulate the events in question further supports the finding that Defendant was able to comprehend and make an informed and intelligent decision as to his rights to counsel and to remain silent.

The evidence supports the trial court's determination that Janto's statements to the police were voluntarily given. The fact that he was a drug and alcohol abuser and had ingested mind-altering substances the night before his confession is insufficient to render his confession involuntary. Janto initiated the contact with the police on June 14, 1997 for the purpose of making a confession. The police adequately determined that Janto's mind was clear and that he had made a voluntary decision to waive his rights and make a statement. Therefore, we affirm the trial court's determination that Janto's statement was voluntary and that he knowingly and intelligently waived his constitutional rights.

**B. The trial court followed the statutorily mandated procedures to determine that Janto was fit to proceed.**

Janto argues that the trial court's determination that he was fit to proceed was inadequate because the trial court did not receive testimony from the examining psychologists regarding the effect of the EEG on their opinion. He focuses primarily on the portion of Dr. Annon's report stating that the data available were "limited" and that, "[s]hould [the neuropsychological or EEG test results] indicate any severe negative findings, then [he] would wish to reexamine [Janto] in regard to his volitional capacity." Because Dr. Annon's report on Janto's fitness to proceed

and penal responsibility left open the possibility of reevaluation, Janto argues that the trial court could not have reasonably relied on the report until Dr. Annon had been provided with the additional test results and rendered an opinion thereon.

Initially, it is necessary to determine the correct standard of review for the trial court's determination of fitness to proceed. The Intermediate Court of Appeals (ICA) has ruled that:

> Most appellate courts have adopted the abuse of discretion standard for reviewing a trial court's determination that a defendant was competent to stand trial. *See, e.g., Buhring v. State,* 453 N.E.2d 228 (Ind. 1983); *State v. Perkins,* [248 Kan. 760] 811 P.2d 1142 (Kan.1991); *State v. Statczar,* [228 Mont. 446] 743 P.2d 606, 613 (Mont. 1987); *Siah v. State,* 837 P.2d 485, 487 (Ok.Cr.App.1992); *State v. Ortiz,* [104 Wash.2d 479] 706 P.2d 1069, 1071 (Wash. 1985).

We choose, however, to apply the two-part standard of review utilized by the Tenth Circuit Court of Appeals in *Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1991). Under this standard, the appellate court must initially assess whether the trial court made its competency determination based on a correct legal standard. This is a question of law subject to *de novo* review. . . .

If the trial court evaluated a defendant's competency by the correct standard, the second inquiry on appellate review is whether the trial court's determination of a defendant's competency is fairly supported by the record of the proceeding at which the determination was made. In other words[,] the substantial evidence standard of review governs the second inquiry.

*State v. Soares,* 81 Hawai'i 332, 350, 916 P.2d 1233, 1251 (1996).

■ This court has never addressed the correct standard of review for a circuit court's determination that a criminal defendant is fit to proceed. We disagree with the *Soares* formulation and, instead, will review the trial court's determination under the abuse of discretion standard.

■ HRS § 704-403 (1993) provides that "[n]o person who as a result of a physical or mental disease, disorder, or defect *lacks capacity to understand the proceedings against the person or to assist in the person's own defense* shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures." (Emphasis added.) This is the statutorily mandated standard for determining competence of a criminal defendant to stand trial.[3] There is no need for an appellate court to engage in *de novo* review of the legal standard utilized by the trial court, where there is only one standard to be applied.[4]

---

3. Pursuant to HRS § 704-403, the trial court must determine whether the defendant either (1) lacks capacity to understand the proceedings against him or her; or (2) lacks capacity to assist in his or her defense. *Accord Siah v. State,* 837 P.2d 485, 487 (Okla.Crim.App.1992), (noting that "competency to stand trial consists of two elements, statutorily defined: (1) the present ability of a person … charged with a crime to understand the nature of the charges and proceedings brought against him; and (2) the ability to effectively and rationally assist in his defense." (citing Okla. Stat. tit. 22, § 1175.1 (1981)).

The circuit court's determination must also meet the procedural due process requirements imposed by the constitutions of the United States and the State of Hawai'i. *See, e.g., United States v. Loyola–Dominguez,* 125 F.3d 1315 (9th Cir. 1997) (stating that "[i]t is well established that a conviction obtained against an incompetent defendant 'is a clear violation of the constitutional guarantee of due process.' *Hernandez v. Ylst,* 930 F.2d 714, 716 (9th Cir.1991). Competency

requires that the defendant have the 'capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.' *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).").

4. The case cited by the ICA analyzed the situation thusly:

> The legal standard by which competency is to be evaluated is constitutionally mandated. Accordingly, the components of that standard, required as they are by the Constitution, do not vary according to the views of a particular court. … The content of the standard of competency is therefore a question of law which we review *de novo.*

*Lafferty,* 949 F.2d at 1550.

We disagree with the *Lafferty* court's analysis. It is not necessary to determine whether the circuit court utilized the correct standard when there is only one standard to apply.

We overrule *Soares* and hold that the trial court's determination that a defendant is competent to stand trial will be reviewed under an abuse of discretion standard. *Accord Siah v. State*, 837 P.2d 485, 487 (Okla. Crim.App.1992) (holding that "[d]etermination of competency to stand trial is a matter left to the sound discretion of the [trial] court"); *State v. Perkins*, 248 Kan. 760, 811 P.2d 1142 (1991) (holding that, "[o]n appeal, the reviewing court's inquiry on a trial court's determination that a defendant is competent is whether the trial court abused its discretion"). The standard for determining competence is statutorily mandated by HRS Chapter 704 and primarily a matter for the professional determination of the examiners appointed by the trial court in accordance with HRS Chapter 704. An abuse of discretion standard is appropriate because the determination relies upon the trial court's assessment of the testimony of expert witnesses and its observational assessment of the defendant.

HRS § 704–404 (1993 & Supp.1998) provides that

    (1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease ... or there is reason to doubt the defendant's fitness to proceed, ... the court may immediately suspend all further proceedings in the prosecution....

    (2) Upon suspension of further proceedings in the prosecution, the court shall appoint three qualified examiners to examine and report upon the physical and mental condition of the defendant....

    ....

    (4) The report of the examination shall include the following:

      ....

    (b) A diagnosis of the physical or mental condition of the defendant.

    (c) An opinion as to the defendant's capacity to understand the proceedings against the defendant and to assist in the defendant's own defense;

    (d) An opinion as to the extent, if any, to which the capacity of the defendant to appreciate the wrongfulness of [his] conduct or to conform [his] conduct to the requirements of law was impaired at the time of the conduct alleged[.]

HRS § 704–405 (1993) provides that, "[w]hen the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed pursuant to section 704–404, the court may make the determination on the basis of such report."

    Defense counsel did not challenge the findings of the three court-appointed examiners. All three reports opined that Janto was fit to proceed and, at the time of the incident, was able to appreciate the wrongfulness of his conduct and conform his conduct to the requirements of law. Therefore, the trial court had an adequate basis for determining that Janto was fit to proceed. There was no evidence available to support a defense of lack of penal responsibility by virtue of substantially impaired cognitive or volitional capacity.[5]

Although Dr. Annon stated in his report that he wished to review the neuropsychological testing, he rendered a definitive professional opinion as to Janto's mental condition. There is no information in the record upon which to base a conclusion that the results of the neuropsychological testing were sufficient to change the opinion of the examiners. It was the responsibility of Janto's counsel to provide the necessary information to the ex-

---

5. HRS § 704–402(1) (1993) provides that "[p]hysical or mental disease, disorder, or defect excluding responsibility is an affirmative defense." HRS § 704–408 (1993) provides:

    If the report of the examiners filed pursuant to section 704–404, or the report of examiners of the defendant's choice under section 704–409, states that the defendant at the time of the conduct alleged suffered from a physical or mental disease, disorder, or defect which substantially impaired the defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law, the court shall submit the defense of physical or mental disease, disorder, or defect to the jury or the trier of fact at the trial of the charge against the defendant.

aminers and inform the trial court of any change in their opinion. The circuit court gave Janto's attorney the opportunity to consult with experts and report any new information.

The trial court acted appropriately in evaluating Janto's fitness to proceed. The uncontroverted evidence before the trial court was that Janto was fit to proceed. Therefore, the trial court's oral ruling was amply supported by the information available. Janto appears to suggest that the trial court erred in failing, *sua sponte*, to suspend the proceedings until the experts had an opportunity to review the EEG findings and make further reports to the trial court. However, the trial court did not abuse its discretion in proceeding with the trial. The trial court had three professional opinions that Janto was fit to proceed. Janto's attorney was given an opportunity, as he requested, to consult with experts in order to determine whether their opinions were changed by the abnormal EEG findings.

The record on appeal does not contain any information as to whether Janto's attorney actually contacted experts and received an opinion as to whether the further test results altered their initial findings. The argument that Janto was denied the effective assistance of counsel thereby is addressed *infra* in section II.D. However, we hold that the trial court did not abuse its discretion in determining that Janto was fit to proceed.

## C. The trial court did not err in admitting the challenged items of evidence.

Janto argues that the trial court erred by admitting, over objection, the following items into evidence: (1) the dental bridgework remains; (2) the eyeglass frame; (3) the eyeglass lens; (4) the blood samples; (5) a photograph of the bloodstained walkway; and (6) a luminal testing photo of the walkway. Items one through four are challenged on the grounds of relevance and insufficient foundation. Items five and six are challenged solely on the ground that they were more prejudicial than probative.

HRE 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence to support a finding that the matter in question is what the proponent claims."

In [*State v. Joseph*, 77 Hawai'i 235, 239, 883 P.2d 657, 661 (App.1994)], the Intermediate Court of Appeals succinctly delineated the analysis by which a trial court determines whether sufficient foundation has been laid for the admission of physical evidence.

Simple logic dictates that the party wishing to introduce an item in evidence must present proper proof of its authenticity and identification. In other words, the proponent of the evidence must prove that the item is what the proponent claims it is. The proponent of the item must lay the foundation for its receipt in evidence in order to prevent inadmissible evidence from being suggested to the jury by any means.... Proper·identification and foundation are established when the prosecution shows that the exhibit is connected with the crime and identified as such.

*State v. Loa*, 83 Hawai'i 335, 350, 926 P.2d 1258, 1273 (1996) (ellipses and some brackets in original).

With regard to the first three challenged exhibits, Janto argues that "there were no markings on any of these damaged items that would indicate that they belonged to Koja, and none of the items had Janto's fingerprints on them.... None of the above-mentioned exhibits could be connected to the crime in any way." This argument is refuted by the evidence in the record. Koja's dentist testified that the bridgework was identical to that which he had inserted. Koja's optometrist testified that the eyeglass frame was identical to one owned by Koja and that the lens matched her prescription. This testimony, and the fact that these items were found at the crime scene, constituted sufficient foundation for the jury to find that they were Koja's belongings.

In the absence of Koja's body, these items of evidence were relevant because their damaged condition corroborated Janto's con-

fession and description of the murder.[6] Moreover, Janto called into question the identity of his victim, stating in closing argument that "[h]e confessed to what he did. But he never identified the person that he had contact with. [The prosecution has] not even established that [he] actually killed Jackie Koja." These items tended to prove that a woman was attacked there and that the woman was Koja. Because adequate foundation was laid and the evidence was relevant to the case, these items were properly admitted.

Regarding the blood sample, Wayne Kimoto, an evidence specialist with the Honolulu Police Department, trained in forensic serology, testified that his analysis of the sample "determined there was the presumptive presence of blood and that this material, this sample was consistent with human origin." Although Kimoto was unable to positively identify the blood as Koja's, Kimoto's testimony laid a sufficient foundation for the introduction of the blood sample. The presence of human blood at the crime scene was relevant circumstantial evidence corroborating Janto's statement that he killed a woman at that spot.

Regarding the photographs of the walkway, Janto argues that this evidence was more prejudicial than probative because "the photo of the pool of blood was taken after a school janitor had washed and shot down the pool with a water hose.... The defense argued that the pool pattern was much larger because of this cleaning attempt and would be substantially prejudicial to Janto if the jury saw it."

"[T]he determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative value and prejudicial effect[.]" *Loa*, 83 Hawai'i at 348, 926 P.2d at 1271 (citation omitted). Janto claims that the area of the stain in the photo was significantly larger than the original pool of blood.

However, he points to no evidence supporting this contention. We cannot say that the trial court abused its discretion in admitting the challenged photograph in the absence of evidence that the original pool was significantly smaller than the stain shown in the photograph. Therefore, we affirm the trial court's admission of the challenged items of evidence.

**D. Janto was not denied the effective assistance of counsel.**

Janto claims that he was denied the effective assistance of counsel because his trial counsel: (1) failed to ensure that the court-ordered mental examination was complete and procedurally correct; (2) failed to present the defense of extreme mental or emotional disturbance; and (3) did not call a mental health expert at the suppression hearing "who could have testified that Janto was under the influence of crystal meth and/or cocaine at the time of his June 12th or June 14th statements."

> When an ineffective assistance of counsel claim is raised, the question is: "When viewed as a whole, was the assistance provided to the defendant 'within the range of competence demanded of attorneys in criminal cases?' " Additionally,
>
>> the defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*State v. Edwards*, 81 Hawai'i 293, 300, 916 P.2d 703, 710 (1996) (quoting *State v. Silva*, 75 Haw. 419, 439–40, 864 P.2d 583, 593 (1993)). The three grounds alleged by Janto to support his claim of ineffective assistance of counsel will be addressed *seriatim*.

---

6. HRE Rule 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

### 1. Mental examination

██ There is no evidence in the record on appeal to support Janto's contention that his attorney failed to follow through on the EEG report. The three examiners all unanimously opined that Janto was fit to proceed and that, at the time of the offense, he had the mental capacity to appreciate the wrongfulness of his conduct. One of the examiners stated that he might reevaluate Janto's condition based on the neuropsychological testing results. When the EEG report was received, Janto's attorney was given the opportunity by the court to consult with experts and inform the court of any change in the professional opinion regarding Janto's medical condition. Janto's attorney did not raise this issue again with the court.

The argument of Janto's appellate counsel that (a) Janto's trial attorney failed to consult with experts regarding the EEG results and/or (b) that the EEG results would have changed the experts' opinions is purely speculative and unsupported by any evidence in the record on appeal. If Janto's attorney did consult with the experts, as he stated that he was going to, and the experts' opinions were unchanged, there would have been no necessity to raise this issue again before the trial court. Therefore, on the record before this court at present, there is no evidence of "specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence," and we reject Janto's claim that he was denied the effective assistance of counsel on this basis.

### 2. Extreme mental or emotional disturbance defense

██ Janto argues that his attorney was ineffective for failing to present an EMED defense pursuant to HRS § 707–702(2) (1993). This section states that:

In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

At a bench conference prior to trial, the prosecutor asked Janto's attorney if he planned to present an EMED defense. Janto's attorney responded, "I don't propose that at this time, your honor. However, I reserve the right to ask for it in light of evidence but at this point in time, no." Janto did not request an EMED instruction and none was given by the trial court.

In support of his argument that an EMED defense was warranted, Janto argues that "[e]nough evidence had been presented ... to believe that Janto was a chronic drug user who, at the time of the commission of the offense, had not slept for several days and was in a drugged state of mind." Although evidence was presented of Janto's drug use and sleeplessness, it is a huge leap to construe, from that information, that he was "under the influence of extreme mental and emotional disturbance." The record does not support an EMED defense and Janto's trial attorney was not ineffective for failing to pursue it.

### 3. Suppression hearing

██ There is no support in the record for Janto's contention on appeal that Janto was under the influence of crystal methamphetamine at the time of his statements to the police. On the contrary, Janto specifically stated on June 14th that he had not ingested drugs for fourteen hours. He further stated that drugs were not affecting his judgment at the time he gave the statement to the police. Therefore, Janto's argument that his attorney should have called a mental health professional to the suppression hearing to testify that he was under the influence of drugs at the time of his statement is misplaced.

For all of the above reasons, we deny Janto's argument that his trial counsel was constitutionally ineffective.

### E. The sentencing court correctly determined that an enhanced sentence under HRS 706–657 must be alleged in the complaint and a finding made by the jury.

The trial court correctly determined that a finding leading to an enhanced sentence pur-

suant to HRS § 706–657 must be made by the trier of fact. If the prosecution elects to seek an enhanced sentence pursuant to this section, it must be alleged in the complaint.[7] This outcome is mandated by *Schroeder* and our recent decision in *Tafoya, supra.* Therefore, on the cross-appeal, we affirm the trial court's denial of the prosecution's motion for enhanced sentence.[8]

HRS § 706–657 provides that:

The court may sentence a person who has been convicted of murder in the second degree to life imprisonment without possibility of parole ... if the court finds that the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As used in this section, the phrase especially heinous, atrocious, or cruel, manifesting exceptional depravity means a conscienceless or pitiless crime which is unnecessarily tortuous to a victim.

Hearings to determine the grounds for imposing an enhanced sentence for second degree murder may be initiated by the prosecutor or by the court on its own motion. *The court shall not impose an enhanced term unless the ground therefor has been established at a hearing after the conviction of the defendant and on written notice to the defendant of the ground proposed.* Subject to the provision of section 706–604, the defendant shall have the right to hear and controvert the evidence against the defendant and to offer evidence upon the issue.

(Emphasis added.)

In its cross-appeal, the prosecution argues that the trial court's determination that the trier of fact, rather than the sentencing court, must make the relevant findings under this section is (a) contrary to the plain language of the statute and (b) is not constitutionally mandated. The plain language of the statute does provide that the sentencing court shall make the requisite findings and that a motion for enhanced sentencing under this section is to be made after a judgment of

conviction for murder is entered. However, pursuant to *Schroeder* and *Tafoya,* the procedures outlined in the statute violate a defendant's constitutional rights to due process and jury trial. Therefore, the sentencing court correctly declined to render such findings.

In *Schroeder,* this court held that:

if the "aggravating circumstances" justifying the imposition of an enhanced sentence are "enmeshed in," or, put differently, *intrinsic* to the "commission of the crime charged," then, in accordance with the [*State v.*] *Estrada* [, 69 Haw. 204, 738 P.2d 812 (1987) ] rule, such aggravating circumstances *"must* be alleged in the indictment in order to give the defendant notice that they will be relied on to prove the defendant's guilt and support the sentence to be imposed, and they must be determined by the trier of fact."

76 Hawai'i at 528, 880 P.2d at 203 (citation omitted) (emphases in original) (some brackets in original and some added).

In *Tafoya,* we stated that:

In reviewing our previous case law, it is apparent that "intrinsic" factors, required to be pled in the indictment and found by the jury, are distinguishable in that they are contemporaneous with, and enmeshed in, the statutory elements of the proscribed offense. Contrarily, "extrinsic" factors are separable from the offense itself in that they involve consideration of collateral events or information.

91 Hawai'i at 271, 982 P.2d at 900.

The fact that the murder was committed in a particularly heinous, atrocious, or cruel manner is contemporaneous with, and enmeshed in, the commission of the offense. These factors are therefore "intrinsic" and, pursuant to *Schroeder* and *Tafoya,* must be alleged in the indictment and found by the trier of fact.

7. The complaint did not allege that the murder was committed in such a manner that enhanced sentencing under HRS § 706–657 would be sought.

8. In this opinion, we address only the procedural requirements for making the requisite findings under this section. Our opinion herein does not address the constitutional validity of the statute itself.

The prosecution contends that the sentencing court's action was not constitutionally required because Janto's right to procedural due process was not violated by following the procedures in the statute. Initially, the prosecution's argument fails to recognize the mandatory nature of *Schroeder*'s holding, that intrinsic sentencing factors *"must* be alleged in the indictment and ... must be found by the trier of fact." (Emphasis in original.) Moreover, as explicated in *Tafoya*, *Schroeder*'s requirement is based both on the sixth amendment right to jury trial *and* procedural due process.

> If a potential penalty might rise from 15 years to life on a nonjury determination, the jury's role would correspondingly shrink from the significance usually carried by determinations of guilt to the relative importance of low-level gatekeeping: in some cases, a jury finding of fact necessary for a maximum 15–year sentence would merely open the door to a judicial finding sufficient for life imprisonment.

[*Jones v. United States,* —— U.S. ——, 119 S.Ct. 1215], 1224 [143 L.Ed.2d 311 (1999) ].

After careful consideration of the issue raised by the *Jones* Court, we agree with the majority that it is an impermissible dilution of the jury's role as factfinder to remove the responsibility for determining the existence of facts leading to the imposition of a particular punishment.

*Tafoya,* 91 Hawai'i at 272–73, 982 P.2d at 901–02.

Because the requirement that the jury find the facts necessary for imposition of a particular punishment is rooted in the Hawai'i constitution's guarantee of right to jury trial, the prosecution's argument that adequate notice was given to Janto by the procedures explicated in HRS § 706–657 is unpersuasive.

Finally, the prosecution suggests certain procedural difficulties in requiring the jury simultaneously to determine guilt and make a finding that the murder was "especially heinous, atrocious, or cruel." The prosecution argues that the process could entail the admission of evidence that would otherwise be excludable as overly prejudicial under HRE Rule 403. We agree with the prosecution that commingling the findings of guilt of the offense of murder in the second degree and enhanced sentencing under HRS § 706–657 in a single proceeding would raise serious evidentiary issues.

■ The solution to this issue will require a bifurcated proceeding.[9] In order to consider the applicability of sentencing pursuant to HRS § 706–657, the jury must first return a verdict of guilty of the offense of murder. Thereafter, an evidentiary hearing before the jury will be required, in which the prosecution and defense will be allowed to present evidence and testimony regarding whether the murder was "especially heinous, atrocious, or cruel."

■ The hearing to determine the applicability of sentencing pursuant to HRS § 706–657 shall be conducted in the trial court, before the trial jury, as soon as practicable after the jury renders its verdict in the adjudicative stage. The court, in its discretion, may allow the prosecution and the defense to present brief opening and closing statements on the issue of whether the murder was "especially heinous, atrocious, or cruel." The order of all arguments will be the same as at the adjudicative stage of the trial.

■ The prosecution and the defense shall be permitted to present evidence and testimony on the issue in the same order as at the adjudicative stage of the trial. The jury may also consider evidence received during the adjudicative stage; neither party need re-elicit evidence previously adduced. Pursuant to *State v. Villeza,* 85 Hawai'i 258, 275, 942 P.2d 522, 539 (1997), ordinary rules of evidence shall apply, and the prosecution shall be required to prove, beyond a reason-

9. For examples of similar bifurcated proceedings, *see* Ala.Code § 13A–5–45 (1994); Ark.Code Ann. § 5–4–602 (Michie 1997); Del Code Ann. tit. 11, § 4209 (1995 & Supp.1998); Nev.Rev. Stat. § 175.552 (1997); Or.Rev.Stat. § 163.150 (1997); Tex.Code Crim. Proc. Ann. § 37.071 (West Supp.1999); Utah Code Ann. § 76–3–207 (Supp.1999); Va.Code Ann. § 19.2–264.4 (Michie Supp.1999); Wash. Rev.Code §§ 10.95.050, 10.95.060 (1990).

able doubt, that the murder was "especially heinous, atrocious, or cruel."

Upon completion of the presentation of evidence and arguments, the court shall instruct the jury that it must determine whether the prosecution has proved, beyond a reasonable doubt, that the murder was "especially heinous, atrocious, or cruel." The jury's finding must be unanimous in order for the court, in the exercise of its sound discretion, to consider an enhanced sentence. The jury shall then conduct its deliberations and submit its findings in response to a special verdict form. If the jury does not come to a unanimous decision that the murder was "especially heinous, atrocious, or cruel" beyond a reasonable doubt, no enhanced sentence shall be imposed. Pursuant to the language of HRS § 706–657, if the jury does find unanimously that the murder was "especially heinous, atrocious, or cruel" beyond a reasonable doubt, the court *may*, in its discretion, impose an enhanced sentence.

These procedures will address the evidentiary concerns raised by a unitary trial and will give the defendant the opportunity adequately to defend against the imposition of an enhanced sentence. During the initial adjudicative stage, the defendant—of necessity—must attempt to convince the jury of the prosecution's failure to prove the offense of murder. This might entail an argument, for example, that defendant had an alibi. It would be unworkable for the defendant to be required to argue to the jurors that he had an alibi, but if they disbelieve that, the manner in which he killed the victim was not atrocious. This is a contradictory position that would undermine the defendant's argument regarding guilt for the charged offense.

Therefore, we affirm the sentencing court's ruling on the cross-appeal. Procedural due process and the right to jury trial constitutionally override the procedures explicated in the statute. An enhanced sentence under HRS § 706–657 must be alleged in the indictment and the requisite finding made by the jury. In future cases, a bifurcated proceeding will be necessary to separate the jury's determinations on guilt and enhanced sentencing.

### III. CONCLUSION

For the foregoing reasons, we affirm Janto's conviction in all respects. Further, we affirm the sentencing court's denial of the prosecution's motion for enhanced sentence under HRS § 706–657 as a matter of law.