33 P.3d 549

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Ann Elizabeth MADDEN, Defendant–Appellant.**

No. 23394.

Intermediate Court of Appeals of Hawai'i.

Sept. 21, 2001.

---

Verdine Kong, Wailuku, on the briefs, for defendant-appellant.

Simone C. Polak, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

WATANABE, Acting C.J., LIM and FOLEY, JJ.

Opinion of the court by LIM, J.

Defendant-Appellant Ann Elizabeth Madden (Madden) appeals the April 5, 2000 judgment of the circuit court of the second circuit, the Honorable Douglas H. Ige presiding, that convicted her of the offenses of theft in the second degree and fraudulent use of a credit card, and sentenced her to a five-year term of probation for each offense, the two terms to run concurrently upon conditions, including one year in jail. On appeal, Madden raises two issues.

First, Madden contends that the court committed plain error by failing to unilaterally and on its own initiative provide police reports of the offenses to a psychiatrist examining her for fitness to proceed. We disagree. Hawaii Revised Statutes (HRS) § 704–404(8) (1993) provides:

> The court shall obtain all existing, medical, social, police and juvenile records, in-

cluding those expunged, and other pertinent records in the custody of public agencies notwithstanding any other statutes, and make such records available for inspection by the examiners.

HRS § 704–404(8) does not require the court to unilaterally and on its own initiative provide pertinent records to a fitness examiner. Our review of the record reveals that the court did not neglect its statutory duty to obtain the police reports and make them available to the fitness examiners. We therefore hold that the court did not commit plain error in this respect.

Madden's second point of error is that the court's finding that she was fit to proceed was based upon inadequate evaluations by the experts, thereby violating her right to due process. We do not hold, with Madden, that constitutional due process requires a fitness examination that "comport[s] with a minimum level of professional competence." We instead conclude that the court did not abuse its discretion in finding Madden fit to proceed.

We therefore affirm the judgment of the court.

## I. Background.

The State alleged in this case that in May of 1999, Madden and an accomplice used the number of an American Express credit card, belonging to the pilot of the chartered Lear jet who flew them to Maui, to steal lodging, food and gift shop items from the Maui Marriott Resort. On May 24, 1999, the State filed a complaint charging them both with theft in the second degree and fraudulent use of a credit card.

On May 27, 1999, Madden moved for a mental examination pursuant to HRS § 704–404 (1993 & Supp.2000), that provides:

(1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution. If a trial jury has been empanelled, it shall be discharged or retained at the discretion of the court. The dismissal of the trial jury shall not be a bar to further prosecution.

(2) Upon suspension of further proceedings in the prosecution, the court shall appoint three qualified examiners in felony cases and one qualified examiner in nonfelony cases to examine and report upon the physical and mental condition of the defendant. In felony cases the court shall appoint at least one psychiatrist and at least one licensed psychologist. The third member may be either a psychiatrist, licensed psychologist, or qualified physician. One of the three shall be a psychiatrist or licensed psychologist designated by the director of health from within the department of health. In nonfelony cases the court may appoint either a psychiatrist or a licensed psychologist. All examiners shall be appointed from a list of certified examiners as determined by the department of health. The court, in appropriate circumstances, may appoint an additional examiner or examiners. The examination may be conducted on an out-patient basis or, in the court's discretion, when necessary the court may order the defendant to be committed to a hospital or other suitable facility for the purpose of the examination for a period not exceeding thirty days, or such longer period as the court determines to be necessary for the purpose. The court may direct that one or more qualified physicians or psychologists retained by the defendant be permitted to witness and participate in the examination. As used in this section, the term "licensed psychologist" includes psychologists exempted from licensure by section 465–3(a)(3).

(3) In such examination any method may be employed which is accepted by the professions of medicine or psychology for the examination of those alleged to be suffering from physical or mental disease, disorder, or defect; provided that each examiner shall form and render diagnoses

and opinions upon the physical and mental condition of the defendant independently from the other examiners, and the examiners may, upon approval of the court, secure the services of clinical psychologists and other medical or paramedical specialists to assist in the examination and diagnosis.

(4) The report of the examination shall include the following:

(a) A description of the nature of the examination;

(b) A diagnosis of the physical or mental condition of the defendant;

(c) An opinion as to the defendant's capacity to understand the proceedings against the defendant and to assist in the defendant's own defense;

(d) An opinion as to the extent, if any, to which the capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law was impaired at the time of the conduct alleged;

(e) When directed by the court, an opinion as to the capacity of the defendant to have a particular state of mind which is required to establish an element of the offense charged; and

(f) Where more than one examiner is appointed, a statement that the diagnosis and opinion rendered were arrived at independently of any other examiner, unless there is a showing of a clear need for communication between or among the examiners for clarification. A description of the communication shall be included in the report.

(5) If the examination cannot be conducted by reason of the unwillingness of the defendant to participate therein, the report shall so state and shall include, if possible, an opinion as to whether such unwillingness of the defendant was the result of physical or mental disease, disorder, or defect.

(6) The report of the examination, including any supporting documents, shall be filed in triplicate with the clerk of the court, who shall cause copies to be delivered to the prosecuting attorney and to counsel for the defendant.

(7) Any examiner shall be permitted to make a separate explanation reasonably serving to clarify the examiner's diagnosis or opinion.

(8) The court shall obtain all existing, medical, social, police and juvenile records, including those expunged, and other pertinent records in the custody of public agencies notwithstanding any other statutes, and make such records available for inspection by the examiners.

(9) The compensation of persons making or assisting in the examination, other than those retained by the nonindigent defendant, who are not undertaking the examination upon designation by the director of health as part of their normal duties as employees of the State or a county, shall be paid by the State.

In her motion, Madden first stated that she was requesting the mental examination

to determine whether [Madden] was suffering from a physical or mental disease, defect, or disorder that would have affected [Madden's] ability to appreciate the wrongfulness of her conduct in allegedly committing the crimes she is charged with, or to conform her conduct to the requirements of the law at the time of the alleged violations.[1]

---

1. Defendant–Appellant Ann Elizabeth Madden (Madden) sought a determination of her mental state at the time of the offenses because:

(1) A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.

(2) As used in this chapter, the terms "physical or mental disease, disorder, or defect" do not include an abnormality manifested only by repeated penal or otherwise anti-social conduct.

Hawaii Revised Statutes (HRS) 704-400 (1993). On August 26, 1999, Madden filed a notice of mental defense signaling her "intention to rely upon a mental defense pursuant to Chapter 704 of the Hawaii Revised Statutes[.]" Madden sub-

(Footnote supplied.) In the request pertinent to this appeal, Madden sought the mental examination to determine

> whether [Madden] is fit to proceed pursuant to Section 704–405 of the [HRS].

Madden moved for an examination of her fitness to proceed because

> [n]o person who as a result of a physical or mental disease, disorder, or defect lacks capacity to understand the proceedings against the person or to assist in the person's own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures.

HRS § 704–403 (1993). When a defendant's fitness to proceed is put at issue,

> the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed pursuant to section 704–404, the court may make the determination on the basis of such report. If the finding is contested, the court shall hold a hearing on the issue. When the report is received in evidence upon such hearing, the party who contests the finding thereof shall have the right to summon and to cross-examine the persons who joined in the report or assisted in the examination and to offer evidence upon the issue.

HRS § 704–405 (1993). If the court determines that a defendant is not fit to proceed,

> the proceeding against the defendant shall be suspended, except as provided in section 704–407, and the court shall commit the defendant to the custody of the director of health to be placed in an appropriate institution for detention, care, and treatment. If the court is satisfied that the defendant may be released on condition without danger to the defendant or to the person or property of others, the court shall order the defendant's release, which shall continue at the discretion of the

court, on conditions the court determines necessary. A copy of the report filed pursuant to section 704–404 shall be attached to the order of commitment or order of conditional release.

HRS § 704–406(1) (1993).

A declaration of Madden's attorney attached to the motion for mental examination detailed numerous instances of Madden's outr'e behavior during the incidents in question. Madden got to Maui by chartering a Lear jet from Las Vegas, though she had no visible means of support. Madden believed, without apparent basis in fact, that she was to meet a friend in Maui who was bringing her a large sum of money in settlement of an employment dispute. Also, Madden claimed to have a seven-year-old daughter, who had never been seen by family and friends. She purported an uncle—John Madden, the professional football commentator. She told people that she was willing to spend up to five million dollars to build a home on Maui. Apparently, Madden's "odd and bizarre" behavior dated back to the death of her father some eight years before. More pertinent to this appeal, Madden's counsel declared that Madden was "unable to recall details of the events leading to her arrest on the present charges[.]"

On June 2, 1999, the court granted Madden's motion for mental examination, suspended the criminal proceedings and appointed a panel of three to examine Madden and report upon her physical and mental condition in accordance with HRS § 704–404. Jon Betwee, M.D. (Dr. Betwee); George C. Choi, Psy.D. (Dr. Choi); and Thomas Cunningham, Ph.D. (Dr. Cunningham);[2] examined Madden and submitted to the court written reports, all dated July 26, 1999, that included the substance required by HRS § 704–404(4).

---

mitted jury instructions on the affirmative defense of lack of penal responsibility "as a result of physical or mental disease, disorder, or defect[.]" HRS § 704–400. *See also* HRS § 704–402(1) (1993). The State apparently acquiesced in the giving of jury instructions on the defense, and the court instructed the jury accordingly. Penal responsibility is not an issue in this appeal.

2. Thomas Cunningham, Ph.D. was the "psychiatrist or licensed psychologist designated by the director of health from within the department of health" required to be appointed by HRS § 704–404(2) (Supp.2000).

Dr. Betwee interviewed Madden on two separate occasions two weeks apart, for a total of one hundred fifty minutes. His examination also included a review of the police reports pertaining to Madden's arrest and telephone interviews with Madden's mother and older sister (who resided in Vermont and New Hampshire, respectively).

Dr. Betwee concluded that "[i]t is not possible to be certain regarding [Madden's] psychiatric status with the data available"; nevertheless, he determined that Madden "fully understands the charges and proceedings, is capable of participating in her own defense and is considered fit to proceed." Dr. Betwee also opined, however, that "[h]er mental state at the time of the offense is less certain but is strongly suspected to have been impaired by sustained, pervasive delusional thought. If this was, in fact, the case, she clearly lacked both the cognitive and volitional capacities to conform her behavior to the requirements of the law."

Dr. Betwee recounted a recent period in Madden's life of frequent moves among various places on the mainland, punctuated by reports of "bad credit card charges[,] . . . a bad check" and a stolen credit card.

Dr. Betwee formulated a "presumptive diagnosis" of "Manic Depressive Illness." During the examination, he observed that Madden "is able to recall some of her behavior such as travel but cannot recall associated motivation, thoughts or feelings occurring at the times in question." Madden also professed a lack of memory of some of her more bizarre behaviors and statements during the subject incident. Dr. Betwee noted that "[p]eople who have recovered from psychotic (delusional) manic episodes often have either no recall or 'patchy' or distorted recall for their own behavior and the circumstances. [Madden] recalls much of her behavior in recent months but freely admits that 'It seems strange now. None of it makes sense[.']"

Dr. Choi interviewed Madden on one occasion for approximately ninety minutes. His evaluation was also based upon "a psychodiagnostic examination, [Madden's] responses to items from the Modified Competency Assessment Instrument, a review of police records provided by the Adult Probation Division, and a review of [Madden's] medical records at the Maui Community Correctional Center."

Dr. Choi concluded that "[Madden] currently has the capacity to understand the criminal proceedings against her or to assist in her defense[.]" He also opined that "[Madden's] cognitive and volitional capacities at the time of the alleged offenses were not substantially impaired due to a major mental illness." Dr. Choi did not arrive at a diagnosis. He instead determined that "there are no clear indications of a major mental disorder."

Dr. Choi noted, here verbatim, that Madden

claims she does not remember committing the offenses for which she is charged with ("I am just going by all the details what other people said", "all the conversations that led to my being here I don't remember. I don't know if I blocked it out. Everything I know now about the past year amazes me"). In hindsight, she is able to recognize the behaviors for which she is charged with as wrongful acts. She only understands the details now as they are presented to her ("I don't remember what I did or what I said. It's ridiculous . . . that John Madden is my Uncle"). However, there are no available psychiatric and/or medical history to explain her claims of memory loss. On the contrary, statements made by witnesses obtained by the Maui Police Department indicate that her behaviors were appropriately goal directed.

Dr. Cunningham's examination of Madden "consisted of a review of records collected by Adult Probation Division, a review of records at Maui Community Correctional Center, telephone conversations with [Madden's] mother and sister, and an interview with [Madden] on July 21, 1999."

Dr. Cunningham's diagnosis of Madden's condition at the time of his meeting with her was "Bipolar I Disorder, Most Recent Episode Manic, In Partial Remission[.]" He opined that, "[a]t the time of our meeting, [Madden's] capacity to understand the proceedings against her, to assist in her own

defense and to consult with her attorney with a reasonable degree of rational understanding was not significantly impaired." Dr. Cunningham's diagnosis for the time of the offenses was "Bipolar I Disorder, Most Recent Episode Manic, Severe, With Psychotic Features[.]" In this respect, he opined that, "[a]t the time of the alleged offenses, it is most likely that [Madden's] cognitive and volitional capacities were substantially impaired by mental disorder."

In the course of his examination, Dr. Cunningham noted that Madden "reported a poor memory for many events of the past year or more."

By written stipulation, the hearing on Madden's motion for mental examination was set for August 24, 1999. At the hearing, the court apparently found that Madden was fit to proceed.[3]

Madden's jury trial commenced on January 18, 2000. However, on January 20, 2000, after the State had commenced its case-in-chief, the defense moved the court for a second mental examination because counsel for Madden questioned her client's ability to assist in her own defense, due to an alleged lack of memory regarding the incident. Specifically, Madden's attorney asserted that Madden did not recognize the Lear jet pilot when he testified at trial, and did not remember whether her co-defendant was present when she was confronted by hotel management about the hotel charges.

After a hearing on the request, the court again suspended the proceedings and granted the request for a new fitness examination, noting that the previous examination had been performed approximately six months before trial. At the request of Madden's attorney, the order issued by the court named a panel of three examiners for the specific purpose of rendering

an opinion as to the extent, if any, to which any physical or mental disease, disorder,

or defect impairs [Madden's] capacity to assist in his/her own defense at the present time, specifically, in light of the fact that these events occurred approximately eight (8) months ago, is [Madden's] inability to recall events and persons testifying, a result of mental illness, and does this condition prevent [Madden] from assisting in her defense.

Madden's attorney drafted the order for approval by the court.

The second panel of three examiners consisted of Doctors Betwee and Choi, who had previously examined Madden in July 1999, and Royal Randolph, Jr., M.D., M.P.H. (Dr. Randolph). At the suggestion of Madden's counsel, and with the agreement of all parties, the court appointed Dr. Randolph to replace Dr. Cunningham (who was the third examiner during the first fitness evaluation) on the panel. Dr. Cunningham was not available to examine Madden soon enough to preserve the sworn jury. Although Dr. Randolph was not a "psychiatrist or licensed psychologist designated by the director of health from within the department of health" required to be appointed by HRS § 704–404(2), the parties waived that statutory requirement.

Dr. Betwee interviewed Madden for forty minutes on January 24, 2000. He did not consider other new sources in formulating his opinions, but referenced those enumerated in his July 26, 1999 report.

Dr. Betwee's January 24, 2000 report confirmed his initial diagnosis of "Bipolar Disorder." [4] He observed that

[Madden's] mental status is improved over that on previous examination. She has recently had a change in antidepressant medication and appears to have recovered from the depression present in June and July, 1999. The opinion that she suffers from Bipolar Disorder is unchanged by

3. The record on appeal does not contain transcripts of any of the pretrial hearings held before January 18, 2000. However, at a hearing held on January 26, 2000, it was noted that the court had previously found Madden fit to proceed.

4. Jon Betwee, M.D. stated that he was even more comfortable in confirming his diagnosis because he had based his July 26, 1999 diagnosis on the higher medical practice standard for "reasonable medical certainty" of 90% certainty, whereas the legal standard is 51% certainty, or "more likely than not[.]"

this change of mental state; she is simply in a state of remission at the present. Dr. Betwee stated that although Madden had less than full recall of the events for which she was charged, "[t]his is not to say that she has no recall as she is able to describe at least several detailed scenes." He reiterated that such partial recall is "related to her mental illness in that this is a common but not universal occurrence in persons with her disorder who have recovered from a recent psychotic episode." Dr. Betwee's final statement was:

> More to the point, it has long been an established legal principle that amnesia, in and of itself, does not preclude fitness to proceed. The reference case is *U.S. v. Wilson* (1996) in which it was held that information from other sources may be sufficient to proceed with trial even if the defendant is unable to personally recall the events.

> Based on the above it is my opinion that [Madden] is fit to proceed.

Dr. Choi's interview of Madden lasted for one hour. In his January 25, 2000 report, Dr. Choi stated that his clinical judgments were also "based on a Mental Status Exam, her responses to the items from the Modified Competency Assessment Instrument, and a review of her medical records at the Correctional Center."

Dr. Choi concluded that "[Madden] presented herself as currently fit to proceed with her trial and to make judicious decisions regarding her welfare." He also opined, here verbatim, that

> [Madden's] inability to recall events and persons testifying in her trial is not a direct result of a mental disorder. Her apparent difficulty with recall is not pervasive. Rather, it appears to be circumscribed around the offenses for which she is charged with. For example, she is able to recall other personal histories including family, medical, and educational. Furthermore, there are no indications of any head injury/trauma or drug abuse that may account for selective memory deficits. In this context, there are no supportive evidence to indicate that her inability to recall certain events or persons is due to a structural impairment of the brain and therefore would hinder her ability to assist in her defense.

Dr. Randolph conducted a forty-minute interview of Madden. In his January 21, 2000 report, Dr. Randolph did not mention any other sources for his opinions. He stated, without elaboration, that "[t]here were no records to review at the Adult Probation Division". No reason was given for the absence of the records. Dr. Randolph did not indicate whether he made inquiry into their absence or took any other steps to obtain them.

Dr. Randolph opined that "[e]xcept for the apparent memory loss of the details of the law violation for which she is charged, [Madden] meets the standard for fitness to proceed." He also stated that "[t]here is a high possibility for malingering in this case[,]" and recommended "neuropsychological testing and neuroimaging (MRI and/or CT scan)" in order to "clarify diagnosis." He also opined that a possible differential diagnosis was "Rule Out (R/O) Malingering, R/O Amnestic Disorder Due to Head Trauma, R/O Major Depression." (Bold print omitted.) Despite the foregoing, Dr. Randolph opined that

> [Madden] does not at the present time lack the capacity to understand the criminal proceedings against her but does lack the capacity to assist in her own defense due to her apparent lack of memory of the alleged law violation. She is therefore *not fit to proceed.*

(Emphasis in the original.)

Madden's second fitness hearing was held on January 26, 2000. At the outset, and with the agreement of the parties, the court received into evidence both reports submitted by Dr. Betwee (dated July 26, 1999 and January 24, 2000) and both reports submitted by Dr. Choi (dated July 26, 1999 and January 25, 2000), and the report submitted by Dr. Randolph (dated January 21, 2000).

Under direct examination by Madden's counsel, Dr. Randolph testified that he based his evaluation of Madden upon an interview lasting "[a]bout 30 to 40 minutes." He did not utilize any other means of investigation or evaluation in support of his opinions. This

established, Madden and the State stipulated that Dr. Randolph "is qualified as an expert . . . in the field of . . . [p]sychiatry."

Dr. Randolph further testified that he based his conclusion that Madden was not fit to proceed upon criteria established by the "Federal Court of Western Missouri in 1961 after the Supreme Court, in a case *Dusty v. the U.S.* [sic; presumably, *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) ][5] was—determined that a person should be mentally fit to proceed, and the Federal Court in Missouri developed this operational criteria to try to objectify a person's fitness." Dr. Randolph had listed in his report "[t]he legal standards used that determine fitness to proceed":

(1) The defendant has "the mental capacity to appreciate her presence in relation to time, place, and things." (2) The defendant has "sufficient elementary mental processes to apprehend (i.e., to seize and grasp with what mind she has) that she is in a court of justice, charged with a criminal offense." (3) The defendant understands that there is a judge on the bench. (4) The defendant "understands that a prosecutor is present who will try to convict her of a criminal charge." (5) The defendant "understands that a lawyer will undertake to defend her against the charge." (6) The defendant understands that "she is expected to tell her lawyer the circumstances, to the best of her ability (whether colored or not by mental aberration) the facts surrounding her at the time and place where the law violation is alleged to have been committed." (7) The defendant "has memory sufficient to relate those things in her personal manner."

Cf. *State v. Soares*, 81 Hawai'i 332, 351–52, 916 P.2d 1233, 1252–53 (App.1996) (listing similar factors to consider in determining a criminal defendant's competence to stand trial). Dr. Randolph went on to testify that Madden did not meet the final prong of the foregoing test. He therefore concluded that "a defendant can't be tried in abstentia [sic],

and if a person doesn't have recall of what they're charged with, then they are basically not there. . . . So in order to be able to cooperate with counsel, they need to have some recall of what they are charged with."

Under cross-examination by the State, Dr. Randolph confirmed that Madden's alleged lack of recall was limited to the period of time during which the offenses occurred. He confirmed his statement in his report, that "there is a high possibility for malingering in this case[.]" He indicated that there was nothing to suggest an "organic" or "psychogenic" basis for Madden's amnesia. Under questioning by the State and by the court, Dr. Randolph called his opinion "preliminary" and reiterated his recommendation that neuropsychological testing and neuroimaging be done in aid of a more definitive opinion. When asked by the State whether "a single incident of transient loss of memory occurring at the time of the criminal act" would lead him to believe that such a memory lapse was feigned, he stated that "it would seem to weigh more toward a feigned memory loss."

When asked on redirect examination whether the absence of the police reports impacted his examination of Madden, Dr. Randolph asserted that he "didn't really need that information." When asked hypothetically whether the police reports "would . . . influence your diagnosis[,]" he stated, "Depends on the quality of that information." Dr. Randolph allowed that if testimony or statements from witnesses regarding Madden's behavior during the incident were available, he would factor those into his diagnosis.

On further cross-examination by the State, Dr. Randolph confirmed that Madden knew, at least, when she did not remember something, and had the ability to inform her attorney accordingly.

---

5.  *See Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (standard for "competency to stand trial" is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him" (internal quotation marks omitted)).

Dr. Betwee testified next. Under examination by the parties and the court, he confirmed in large part the opinions he expressed in his written reports to the court. When asked about his reliance upon "a case[,]" Dr. Betwee responded:

Yes, I include that in my report. I'm not a legal scholar and I didn't read the case. It was simply cited in some forensic psychiatry material [a "board examination review course for certification [in] forensic psychiatry"], and on that basis I made some telephone calls to some national forensic experts asking their opinion about matters of this kind.

Dr. Choi also testified at the hearing. He, too, confirmed in essence the opinions expressed in his written reports to the court.

After hearing arguments by the parties, the court asked Madden's counsel whether it should follow up on Dr. Randolph's suggestion that further testing might produce a more definitive opinion regarding Madden's fitness to proceed. Madden's attorney requested "that the Court do order those additional tests so it will assist in the determination." However, after taking a recess, the court proceeded to rule on Madden's fitness to proceed, holding that

the standard for determining competence is statutorily mandated by HRS Chapter 704 and is primarily a matter for the professional determination of the examiners appointed by the trial court in accordance with HRS Chapter 704. An abuse of discretion standard is appropriate because a determination relies upon the trial court's assessment of the testimony of the expert witnesses and its observational assessment of the defendant.

As I see [Madden] now, reviewed her during this—the course of the jury selection and the trial, a day and a half of trial, and during this hearing, she appears to me to be able to understand the proceedings and to assist counsel.

The doctors all agree, as far as her mental capacity from the reports, that she is able to understand the proceedings, so I don't think that's an issue. The issue is whether or not she can assist in her own

defense because she does not have any recollection of certain incidents.

Now, there is a difference of opinion by the doctors. Dr. Choi does not believe—his opinion is that her memory loss, if any, is not the result of any mental illness, defect, disorder or disability, and believes that she is fit to proceed.

Dr. Betwee believed—his opinion is that the—it is related to her mental illness, the memory loss, but he still believes that she is fit to proceed.

Dr. Randolph's opinion is that he cannot give an opinion at this time as to whether or not it's—any memory loss is related to the—any memory loss is related to any mental illness, defect, disorder or disability.

Looking at all of the reports as a whole, and trying to see some consistency, it appears that all the doctors, although they cannot test the genuineness of [Madden's] inability to recall, are suspicious of it, suspect, high possibility, malingering, or they don't believe—it's too selective.

In looking at it all, it's highly suspect that the defendant does have that—such a loss of memory that she cannot assist counsel, if she has any loss of memory at all, and there is no—there is no real conclusion from all of the doctors that it's based on her mental illness.

Looking at the memory loss issue, I don't think that it would—will prevent [Madden] from assisting in her own defense, in having a fair trial. What has been raised so far is that [Madden] does not remember the pilot, and [Madden] ... thought that the co-defendant ... was present with her at the time at the front desk [of the hotel].

Now, it's not uncommon also for people not to remember certain individuals or not—or thought that someone was there who was not present. I don't think this is material to the—to her defense, and the memory loss issue was also mentioned in the reports by the doctors that were filed in July of 1999, and this does not—did not appear to be a concern at that time and was not raised as an inability of [Madden] to assist in her own defense.

. . . .

Therefore, using the standard set forth in *Jonto* [sic; presumably, *State v. Janto,* 92 Hawai'i 19, 986 P.2d 306 (1999) ], using my discretion, and looking at all the reports and the appearance of—my assessment of [Madden], my observation, and what's been presented to me as far as her memory loss is concerned, I find that [Madden] is fit to proceed with the trial and will deny the motion to suspend the proceedings any further.

However, the court then returned to the question of further testing:

As far as the request to have Dr. Randolph or someone—another person conduct the test that was mentioned by Dr. Randolph, if the defense wishes to pursue that, they might—they may. I leave that up to them, whether they wish the [sic] pursue it or not, but I just say that based on my assessment of [Madden's] memory and her—what she has remembered, I don't think it will affect her defense.

So I—but I will leave it up to the defense whether they wish to pursue that and see whether it will shed more light on the matter.

After the court found Madden fit to proceed for the second time, the State's case-in-chief continued and concluded. Madden's defense consisted of the testimony of Dr. Betwee and Dr. Cunningham. Both defense witnesses testified to their opinions that Madden was not penally responsible at the time of the incidents in question. The case was submitted to the jury on February 2, 2000. On February 3, 2000, the jury delivered a verdict of guilty as charged on both counts. On April 5, 2000, the court sentenced Madden to a five year term of probation on each count, the terms to run concurrently upon terms and conditions including one year in jail. Madden filed a timely notice to appeal on April 25, 2000.

## II. Standards of Review.

### A. *Plain Error.*

■ "We may recognize plain error when the error committed affects the substantial rights of the defendant." *State v. Lee,* 90 Hawai'i 130, 134, 976 P.2d 444, 448 (1999) (internal quotation marks and citations omitted). *See also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2000) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

### B. *Fitness to Proceed.*

■ On appeal, "the trial court's determination that a defendant is competent to stand trial will be reviewed under an abuse of discretion standard." *State v. Janto,* 92 Hawai'i 19, 29, 986 P.2d 306, 316 (1999) (citations omitted). In this regard,

[t]he standard for determining competence is statutorily mandated by HRS Chapter 704 and primarily a matter for the professional determination of the examiners appointed by the trial court in accordance with HRS Chapter 704. An abuse of discretion standard is appropriate because the determination relies upon the trial court's assessment of the testimony of expert witnesses and its observational assessment of the defendant.

*Id.* at 29, 986 P.2d at 316. "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Cullen,* 86 Hawai'i 1, 9, 946 P.2d 955, 963 (1997) (internal quotation marks and citations omitted).

### C. *Questions of Constitutional Law.*

■ "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Kotis,* 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999) (Some internal quotation marks and citations omitted).

### D. *Statutory Construction.*

■ The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo.* In addition, our foremost obligation is to ascertain and give effect to the inten-

tion of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning. Finally, in determining the purpose of the statute, we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history.

*State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (brackets, citations, ellipsis and internal quotation marks omitted). Furthermore,

we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool. This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (brackets, citations, ellipses and internal quotation marks omitted).

### III. Discussion.

A. *The Court Did Not Err by Failing to Unilaterally Provide the Police Reports to Dr. Randolph.*

Madden first argues that HRS § 704–404(8) requires the court to unilaterally and on its own initiative provide police reports and other pertinent records to the fitness examiners:

The intent of the legislature is clearly pronounced, that is, that the court is required to provide the examiners with the police reports and records pertinent to the case. The purpose is to ensure that the sanity examiners' objectivity and accuracy will be enhanced by the additional information, and the court is charged with the duty of implementing the procedure in favor of preserving the confidences of the defendant. The requirement of desseminating [sic] the information to the examiners contributes to the overall goal of assisting the examiners in rendering an objective and accurate report.

Madden contends that in this case, the court's nonfeasance prejudiced her because Dr. Randolph was not provided with the police reports in connection with his examination. Madden asserts that, without the police reports, Dr. Randolph lacked an indispensable touchstone for adequately evaluating the effect of her lack of recall of the subject incident upon her fitness to proceed. The result, Madden claims, was that the court violated her constitutional due process rights and abused its discretion in finding her fit to proceed.

Because Madden failed to object on this basis below, the question is one of plain error. "We may recognize plain error when the error committed affects the substantial rights of the defendant." *Lee,* 90 Hawai'i at 134, 976 P.2d at 448 (internal quotation marks and citations omitted).

In this connection, a statutory right can be considered a "substantial right" in this jurisdiction. *See, e.g., State v. Carvalho,* 79 Hawai'i 165, 174, 880 P.2d 217, 226 (App.1994) (a criminal defendant's exercise of his peremptory challenge, though a statutory rather than a constitutional right, is a "substantial right" and the trial court's denial of that right may be noticed by the appellate court as plain error where not objected to below).

■ Here, we first simply pose the question whether HRS § 704–404(8), in particular, confers any "substantial right" upon Madden. Assuming *arguendo* that it does,

and that plain error analysis is therefore appropriate, we nonetheless decide that the court did not err because it had no obligation under the statute to unilaterally and on its own initiative provide the police reports and other pertinent records to its fitness examiners. HRS § 704–404(8) provides:

> The court shall obtain all existing, medical, social, police and juvenile records, including those expunged, and other pertinent records in the custody of public agencies notwithstanding any other statutes, and make such records available for inspection by the examiners.

The plain language of HRS § 704–404(8) requires only that the court "obtain" the pertinent records and "make such records available for inspection by the examiners"; it does not require, as Madden contends, that the court, unbidden, provide such records directly to the examiners.

The legislative history of HRS § 704–404(8) is likewise devoid of any indication that the court must, unilaterally and on its own initiative, provide all pertinent records directly to the examiners. Before its amendment in 1983, HRS § 704–404(8) (1976) provided:

> There shall be made accessible to the examiners all existing medical, social, and other pertinent records in the custody of public agencies notwithstanding any other statutes.

The Senate Conference Committee Report on the 1983 amendment to HRS § 704–404(8) (1983 Haw. Sess. L. (Vol. 1) Act 172, § 1 at 346) provided, in pertinent part:

> Your Committee upon further consideration amended the bill to clarify that the court will be responsible for obtaining, holding, and making records available for inspection by the examiners. Your Committee finds that placing the responsibility on the court for obtaining and keeping the records will afford additional protection to the privacy of the person involved.

Sen. Conf. Comm. Rep. No. 18, in 1983 Senate Journal, at 1009.

We think it clear from both the plain language of the statute and its legislative intent that the court need only obtain the pertinent records and make them accessible to the examiners. In naming the court as the responsible agency in the 1983 amendment, the legislature sought to thereby ensure access for the examiners and preservation of privacy for the individual(s) involved, but no more.

From a practical perspective, we look askance at any requirement that the court take the initiative in providing records to its fitness examiners. How the court would divine what records a particular examiner, of a particular school of thought, would consider pertinent in the evaluation of a particular defendant, for a particular purpose, is for us a perfect ponder.

With respect to the court's statutory duty, properly understood, there is no showing on the record before us that the court failed to obtain and make available to Dr. Randolph the police reports pertaining to Madden. We know that previously those police reports had been obtained and made available, because Drs. Betwee and Choi made specific reference to the police reports as sources of pertinent information in their respective July 26, 1999 reports. Dr. Randolph simply stated in his report that "[t]here were no records to review at the Adult Probation Division." There is no suggestion whatsoever in the record that the court failed to make them available at his request. Instead, there is every indication that Dr. Randolph felt no need for them and for that reason did not even request them. At the second fitness hearing, he testified under questioning by Madden's counsel that, "I didn't really need that information."

It appears that for Madden, as well, the police reports were of little moment, at least at that time. Having had the opportunity to review Dr. Randolph's report and to examine him on the very issue of the police reports at the fitness hearing, Madden did not request a continuance to obtain the police reports and have him review them. At the conclusion of the fitness hearing, the court offered Madden the opportunity to follow up on Dr. Randolph's suggestion of further testing in aid of a more definitive diagnosis. Madden did not seize that opportunity to place the police reports into the mix as well.

To put all of this into perspective, it is important to remember that Dr. Randolph was Madden's lead-off witness at the second fitness hearing and supported her position, in that he opined that she was not fit to proceed. Hence, if error there was, it was certainly harmless. *See State v. Holbron*, 80 Hawai'i 27, 32 & 32 n. 12, 904 P.2d 912, 917 & 917 n. 12 (1995) (with the possible exception of a limited class of trial errors not relevant here, the standard of review applicable to all trial errors is the "harmless beyond a reasonable doubt" standard). In this respect, however, Madden argues that, although Dr. Randolph concluded that she was not fit to proceed, his review of the police reports would have eliminated his impressions regarding possible malingering, thereby strengthening his opinion in her favor.

Here, however, we enter the realm of pure speculation. When Dr. Randolph was asked specifically by Madden's attorney whether information about the circumstances of her arrest would have influenced his opinion, he was lukewarm: "Depends on the quality of that information." He was similarly tepid when asked to appraise the effect of a hypothetical review of the police reports on his opinions. He could only allow that if he had reviewed such information, he would have factored it into his analysis. Hence, it would be mere speculation to assume that Dr. Randolph's review of the police reports would have made any significant difference.

In light of the foregoing, we simply cannot conclude that the court plainly erred in this respect.

B. *The Bases for the Court's Finding that Madden was Fit to Proceed Were Not Unreliable.*

Madden next argues that "the Court abused its discretion in finding [Madden] fit to proceed based on the faulty procedures and misunderstanding of the law that the doctors based their opinions upon." Madden takes specific issue with the examinations and corresponding reports submitted by Drs. Randolph and Betwee. In her words, "Dr. Randolph had inadequate information upon which to base his opinion, and Dr. Betwee relied upon a case that he had not read, to conclude [Madden] was fit to proceed."

With respect to Dr. Randolph, we again note that Madden called him as her first witness at the second fitness hearing, and that his ultimate opinion was that she was not fit to proceed. We also note that Madden stipulated to Dr. Randolph's expertise after she had established that his examination consisted of only a thirty-to-forty minute interview with her. With respect to Dr. Betwee, we observe that Madden called him as her lead-off witness at trial, relying upon the Betwee report she now criticizes as inadequate in her affirmative defense of penal irresponsibility. Nonetheless, Madden urges us to conclude that the two doctors submitted flawed opinions, and that the court abused its discretion in relying upon their opinions in finding Madden fit to proceed. We decline to do so for the following reasons.

Madden styles her argument as one of constitutional due process, relying upon *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). There, the United States Supreme Court, relying upon the "due process guarantee of fundamental fairness" implicit in the Fourteenth Amendment to the United States Constitution, *id.* at 76, 105 S.Ct. 1087, held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83, 105 S.Ct. 1087. Madden seizes upon the phrase "appropriate examination" in contending that a criminal defendant has a constitutional due process right, not only to a competent fitness examiner, but also to a fitness examination and report that "comport with a minimum level of professional competence."

However, *Ake* was a case in which the trial court denied the indigent defendant's request for a state-funded psychiatrist to examine him and assist in presenting his defense of penal irresponsibility. *Id.* at 72, 105 S.Ct. 1087. The issues of the competence of the

psychiatrist and the adequacy of his examination were therefore not before the Court.

Moreover, Ake was denied, fundamentally, the only means to "a fair opportunity to present his defense" of penal irresponsibility, *id.* at 76, 105 S.Ct. 1087, "the raw materials integral to the building of an effective defense." *Id.* at 77, 105 S.Ct. 1087. *Ake* did not involve a fitness examination under our statutes, in which the fitness examiners are appointed by the trial court and supervised and instructed in their work by the trial court, and whose work product is evaluated and accepted or rejected by the trial court as part of a more holistic inquiry. HRS § 704–404, *passim;* HRS § 704–405 ("the issue [of the defendant's fitness to proceed] shall be determined by the court"); *Janto,* 92 Hawai'i at 29, 986 P.2d at 316 ("An abuse of discretion standard is appropriate because the determination [of a defendant's fitness to proceed] relies upon the trial court's assessment of the testimony of expert witnesses and its observational assessment of the defendant.").

Because the ultimate determination of a defendant's fitness to proceed is reserved to the trial court, we question whether a constitutional due process test of the underlying evaluations can have a viability independent and apart from appellate review of the general exercise of the trial court's discretion in this regard, itself an inquiry into constitutional due process. *Id.* at 28 n. 3, 986 P.2d at 315 n. 3.

At any rate, in *Harris v. Vasquez,* 949 F.2d 1497 (9th Cir.1991), the Ninth Circuit Court of Appeals addressed the question of whether *Ake* requires "access to a qualified psychiatrist who conducts professionally competent examinations of the defendant and who on this basis provides professionally competent assistance." *Id.* at 1516 (internal quotation marks and citation omitted). Harris had argued that his two state-funded defense psychiatrists "incompetently performed their evaluations of him; [which] deprived him of evidence showing that he did not premeditate and essential mitigating evidence for the penalty hearing." *Id.* at 1506. The *Harris* court concluded that all *Ake* requires is that the state "provide an indigent defendant with *access* to psychiatric assistance at the guilt phase of a trial, when the defendant has demonstrated that his sanity at the time of the offense is likely to be a significant factor in determining guilt[,]" *id.* at 1516 (emphasis in the original), and therefore rejected the defendant's claim that *Ake* required more.

In support of its conclusion, the *Harris* court adopted the reasoning of the Seventh Circuit Court of Appeals in *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990). In *Silagy,* the post-conviction petitioner argued that he was denied his Fourteenth Amendment right to due process because two psychiatrists who testified at his trial were " 'incompetent' in their examinations and ultimate diagnoses regarding his sanity at the time of his offense." *Id.* at 1012. The petitioner premised this contention on *Ake, supra,* and on the affidavit of the third examining psychiatrist, which stated that "the diagnoses and trial testimony of [the two other psychiatrists] were not professionally sound." *Id.* at 1012 (footnote omitted).

In rejecting the petitioner's claims, the *Silagy* court reasoned that "[e]very aspect of a criminal case which involves the testimony of experts could conceivably be subject to [a competence review]—a never ending process." *Id.* at 1013. The court noted also that, "[a]s was pointed out by the Court in *Ake,* the fact that due process requires that a competent psychiatrist be appointed does not mean that the indigent defendant has a constitutional right to select a psychiatrist of his personal liking or one who will testify in his favor." *Id.* at 1013 n. 22 (citation omitted). *See also Granviel v. Lynaugh,* 881 F.2d 185, 192 (5th Cir.1989) (a criminal defendant has no constitutional right to appointment of a psychiatrist "who will reach biased or only favorable conclusions").

It appears, therefore, that Madden relies upon a proposition of federal constitutional law that has no support in that law. While a case may yet arise that legitimately presents the issue under the Hawai'i Constitution, this is not that case.

Madden argues that Dr. Randolph's examination "did not comport with a minimum level of professional competence" and there-

fore "did not meet the minimum level required to guarantee protection of [Madden's] due process rights" because "he did not conduct any tests" and did not review any "collateral resources to confirm any information she gave him," instead relying on a thirty-to-forty minute interview with her.

However, HRS § 704–404(3) provides, in pertinent part, that

[i]n such examination any method may be employed which is accepted by the professions of medicine or psychology for the examination of those alleged to be suffering from physical or mental disease, disorder, or defect[.]

Madden does not argue, and the record does not in any way reflect, that the interview format employed by Dr. Randolph is not "accepted by the professions of medicine or psychology for the examination of those alleged to be suffering from physical or mental disease, disorder, or defect[.]" HRS § 704–404(3).

Madden also argues that Dr. Randolph's examination was incomplete, by reference to his recommendation that neuropsychological testing and neuroimaging be done in aid of a more definitive opinion. But in *Janto, supra*, the Hawai'i Supreme Court encountered the same argument, based upon similar circumstances, and rejected it.

Janto had argued on appeal that the trial court's determination that he was fit to proceed was "inadequate" because the examiners did not testify about the effect of an electroencephalogram on their opinions. Specifically,

[b]ecause Dr. Annon's report on Janto's fitness to proceed and penal responsibility left open the possibility of reevaluation, Janto argues that the trial court could not have reasonably relied on the report until Dr. Annon had been provided with the additional test results and rendered an opinion thereon.

*Janto*, 92 Hawai'i at 27–28, 986 P.2d at 314–15. In rejecting this argument, the supreme court noted that, as is the case here,

[t]here is no information in the record upon which to base a conclusion that the results of the neuropsychological testing

were sufficient to change the opinion of the examiners.

*Id.* at 29, 986 P.2d at 316. The supreme court further noted that, as was the case here,

[i]t was the responsibility of Janto's counsel to provide the necessary information to the examiners and inform the trial court of any change in their opinion. The circuit court gave Janto's attorney the opportunity to consult with experts and report any new information.

*Id.* at 29–30, 986 P.2d at 316–17. Hence, in this case, the court's reliance, if any, upon Dr. Randolph's opinions was unexceptionable.

With respect to Dr. Betwee, Madden argues that his reference to *Wilson v. United States*, 391 F.2d 460 (D.C.Cir.1968), was an inaccurate interpretation of the rule in that case, and that "[w]ithout consideration of Dr. Betwee's misplaced reliance on a case he had not read, Dr. Betwee's testimony would have supported a finding [sic] that [Madden] was not fit to proceed." The relevant portion of Dr. Betwee's January 24, 2000 report states:

More to the point, it has long been an established legal principle that amnesia, in and of itself, does not preclude fitness to proceed. The reference case is *U.S. v. Wilson* (1966)[sic] in which it was held that information from other sources may be sufficient to proceed with trial even if the defendant is unable to personally recall the events.

While Dr. Betwee cited the district court opinion below, *United States v. Wilson*, 263 F.Supp. 528 (D.D.C.1966), his presentation of the general rule approved on appeal to the District of Columbia Court of Appeals was, while a bit simplistic, not erroneous. *See Wilson*, 391 F.2d at 462–64. In any event, Madden's contention that Dr. Betwee's opinion would have been different absent the reference to *Wilson* is pure speculation, especially in light of the ample other sources and reasons he relied upon for his opinions.

*C. The Court Did Not Abuse its Discretion in Finding Madden Fit to Proceed.*

Shorn of all its subsidiary concerns, the gravamen of Madden's appeal is

that her lack of recall of certain specifics of the offense, *per se*, rendered her unfit to proceed to trial. This proposition is, however, directly contrary to the well-accepted principle that a loss of memory of the alleged offense does not in and of itself preclude fitness to proceed. *See Beauregard v. State*, 372 So.2d 37, 43 (Ala.Crim.App.1979) (simple inability to recall the offense); *Davis v. State*, 354 So.2d 334, 339 (Ala.Crim.App.1978) (in a case involving a defendant who was intoxicated at the time of the offense, noting as a policy consideration the "potential for fraudulent allegations of memory loss" (internal quotation marks and citation omitted)); *Lawrence v. State*, 39 Ark.App. 39, 839 S.W.2d 10, 13 (1992) (amnesia due to head injury suffered during the offense); *People v. Amador*, 200 Cal.App.3d 1449, 246 Cal.Rptr. 605, 607 (1988) (in a case involving amnesia due to a head injury sustained during the offense, noting that courts have "[a]lmost universally" held that amnesia in and of itself does not render a defendant unfit to stand trial (citation omitted)); *Mauldin v. State*, 382 So.2d 844, 846 (Fla.Dist.Ct.App.1980) (lack of recall due to chronic alcoholism); *Aldridge v. State*, 247 Ga. 142, 274 S.E.2d 525, 530 (1981) (defendant had been drinking all day of the offense); *State v. Gilder*, 223 Kan. 220, 574 P.2d 196, 201 (1977) (amnesia due to delusional state); *Commonwealth v. Lombardi*, 378 Mass. 612, 393 N.E.2d 346, 348 (1979) (in a case involving permanent amnesia due to a serious post-offense beating, noting that lack of memory is in this respect akin to lost evidence or the death of a witness, neither of which precludes trial); *State v. Davis*, 653 S.W.2d 167, 173 (Mo.1983) (amnesia due to brain lesion); *State v. Van-Natta*, 506 N.W.2d 63, 68 (N.D.1993) (inability to distinguish between reality and fanta-

sy); *Siah v. State*, 837 P.2d 485, 487 (Okla. Crim.App.1992) (chronic alcoholism). While a number of courts would consider loss of memory of the alleged offense as part of a multivariate analysis of a defendant's fitness to proceed, *see, e.g., Lombardi*, 393 N.E.2d at 349, we are not confronted with that situation here. Madden relies for her lack of fitness upon an allegation of amnesia unadorned by other potent factors.

Before we conclude, we observe in passing that the court did not rely solely upon the opinions of the fitness examiners in finding Madden fit to proceed. The court also concluded, on the issue of her lack of recall, that the specific instances advanced by Madden's counsel were not "material to the—to her defense[.]" Certainly, the specific instances were just two in a welter of evidence presented at trial. Undoubtedly, they were neither central to nor dispositive of her guilt or innocence.

The court further relied upon its own observations of Madden and its strong suspicions about malingering.

In light of the foregoing, we conclude that the court did not abuse its discretion in finding Madden fit to proceed.

## IV. Conclusion.

The April 5, 2000 judgment of the circuit court of the second circuit is affirmed.